# Richmond.

## HARRY S. COBB v. COMMONWEALTH.

January 17, 1929.

Absent, Chichester, J.

The opinion states the case.

*N. T. Green*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General*, for the Commonwealth.

HOLT, J.; delivered the opinion of the court.

On December 5, 1927, the Norfolk police, in response to certain information, raided a residence in that city, located on the southwest corner of Evergreen avenue

and Glendale avenue.   On its second floor they found
no household furniture, but a steam boiler, water tank,
some wash tubs and empty barrels.   They also found
hidden there under a concealed trap door one hundred
and twenty gallons of whiskey in wooden or glass con-
tainers.   There was some furniture on the first floor,
but no other articles of daily use.   That is to say,
there was nothing to indicate that this house was at
that time used as a residence.   In the kitchen of the
first floor was a box of new Chevrolet automobile tools.
Nothing was disturbed, but a policeman was left in
charge and to keep watch.   On the following morning,
the defendant, in company with one Lane, his nephew,
drove up in a new Chevrolet automobile.   They parked
this car and Cobb gave Lane a latch key to the front
door.   By its aid Lane entered and was immediately
placed under arrest.   Within a short time knocking
was heard at the back door.   This the officer in charge,
who then held Lane in custody, opened, found Cobb
there and placed him also under arrest.   On that day
Cobb and Lane were arraigned before the police justice
of the city who dismissed the charge against them, but
their case was then immediately presented to a grand
jury, and on the following day a joint indictment was
returned, which set out the omnibus count, charged the
unlawful possession of ardent spirits and the possession
of instrumentalities capable of being used in its manu-
facture.

The officers removed from the premises the per-
sonalty found there, except the whiskey.   This they
left, placed on the trap door certain little inconspicuous
articles, and continued to keep the house under sur-
veillance.   While it was thus watched Cobb visited it
on several occasions, always in company with one or
more people, save once when he went by himself.

After each of these visits the house was inspected, and in each instance it was found that the articles placed on the trap door had been moved, although none of the whiskey was disturbed. Some time before the raid, Cobb had placed this house in the hands of Hoggard & Co., rental agents, and they had leased both floors to tenants brought by Cobb, the upper one to C. C. Cox and the lower to R. F. Almond, and on these leases rent had been regularly paid. Cobb's reputation as an habitual violator of the liquor law was bad.

Cobb testified on his own behalf. He said that he was the owner of these premises, but did not live there and exercised no control. He also denied that he knew Cox, the lessee of the upper story, and testified that he knew nothing about the articles of personalty found, with the exception of a little furniture on the first floor, put there before the apartment was rented. He further said that on December 4, he was called over the 'phone by a stranger and told that something unusual was going on in this Evergreen avenue house, and that it was in response to this call that he and his nephew, Lane, drove there in a new Chevrolet automobile. Upon their arrival, he gave a latch key to Lane, told him to go to the front door and knock, to use it if he was not admitted, and in such event to let him in at the back door. He further stated that after he had been indicted by the grand jury, he went to this house on five or six occasions, always in company with other people, once with his wife; that they cleaned it up, but did not remember having removed any articles placed upon the trap door, and indeed did not know that any trap door was there.

On April 9, 1928, the case came on to be heard and was heard by the court without the intervention of a jury. This order was entered on that day:

"This day came the defendants, and on their joint motion, with the consent of the attorney for the Commonwealth, the whole matter of law and fact was heard and determined by the court."

Lane was acquitted and judgment was reserved as. to Cobb. On April 27, 1928, the court found him guilty as charged in the second count of the indictment— that is to say, he was found guilty of the unlawful possession of ardent spirits, was sentenced to three months. in jail, and fined $250.00. Execution of this judgment was postponed until June 4, 1928, to permit him to apply to this court for a writ of error and he was admitted bail. On May 5, 1928, he appeared in person and with his attorney, and moved the court "to set aside its judgment heretofore entered against him on the 27th day of April, 1928, and grant him a new trial, on the further grounds that the defendant did not, in. person, give his consent to be tried by the court."

Not being advised of its judgment, the court continued this motion until June 4, 1928, when it was overruled. The bills of exception were signed on July 5, 1928, more than sixty days from April 27, 1928, but less than sixty days from June 4, 1928.

Section 6252 of the Code of 1919, as amended, provides in part: "* * * Any bill of exception may be tendered to the judge and signed by him, at any time before the final judgment is entered, or within sixty days from the time at which such judgment is entered * * *."

We are to decide if the sixty days within which the bills of exceptions are to be signed began to run on April 27, 1928, the date upon which the judge first gave judgment, or from June 4, 1928, the date on which the motion of May 5, 1928, to set that judgment.

aside was finally passed upon and on which it was confirmed.

For the Commonwealth it is said that this motion did not serve to suspend the running of the statute, and that the bills of exception signed July 5, 1928, were signed too late.

We are of opinion that this position is not well taken, and while there is some conflict of authority, its weight is with the defendant.

In 4 Corpus Juris, at page 278, it is said: "Where there is interposed a motion for a new trial, rehearing, or in arrest of judgment and new trial, the time for settling and filing the bill is to be computed from the date when the motion is finally disposed of, provided the motion is filed in time and in other respects conforms with legal requirements; and where such motion is continued and not passed on until the next term, a bill of exceptions may also be settled at any time during the same term. But it has been held that appellant need not delay filing his bill until the motion for a new trial is disposed of; he may file it at any time previous to the court's ruling, without permission from the trial court."

In *Cole* v. *State*, 75 W. Va. 410, 80 S. E. 487, Ann. Cas. 1916D, 1256, the court said: "In the case of *Aspen Mining and Smelting Co.* v. *Billings*, 150 U. S. 31, 36, 14 Sup. Ct. 4, 6 (37 L. Ed. 986), it was decided, that if a motion or petition for rehearing is made, or presented in season, and entertained by the court, the time limited for writ of error or appeal does not begin to run until the motion is disposed of. 'Until then,' says the court (150 U. S. at page 36, 14 Sup. Ct. at page 6, 37 L. Ed. 986), 'the judgment or decree does not take final effect for the purposes of the writ of error or appeal.' Citing other Supreme Court decisions. We, therefore, afirm the first question."

In *Adrian Furniture Mfg. Co.* v. *Lenawee Circuit Judge*, 92 Mich. 295, 52 N. W. 615, the court said: "But where a motion for a new trial is made it would be useless labor to prepare a bill of exceptions in advance of the determination of the motion."

And in *Mahoning Valley R. R. Co.* v. *O'Hara*, 196 Fed. 945, the Court of Appeals said: "It would be a vain thing to settle a bill of exceptions upon a judgment still continued; and we are clear that the court had full power on this subject during the remainder of the term at which the motion for a new trial was decided."

The preparations of bills of exception is at times both onerous and expensive. Moreover, upon occasion there is vigorous controversy as to what should be properly included. To require a litigant to incur this trouble and expense, and to put the court to the necessity of deciding issues when the ultimate necessity for such decisions might never arise, would be at times highly burdensome. Our judgment on this matter is that the sixty day period began to run from the 4th day of June, 1928, and not from the 27th day of April, 1928. It follows that the bills of exceptions were signed within the statutory period. This would still be true if we were to count the eight days that elapsed between April 27th and May 5th.

In the first assignment of error it is charged that the judgment is unconstitutional in that defendant had not given in person consent to be tried by the court without a jury, as provided by law.

In the Virginia Bill of Rights, at section 8 of our Constitution, as it was before the recent amendment (see Acts 1928, page 638), it is said: "That in all criminal prosecutions a man hath a right to demand the cause and nature of his accusation, to be confronted.

with the accusers and witnesses, to call for evidence in his favor, and to a speedy trial by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty; provided, however, that in any criminal case, upon a plea of guilty, tendered in person by the accused, and with the consent of the attorney for the Commonwealth, entered of record, the court shall, and in a prosecution for an offense not punishable by death, or confinement in the penitentiary, upon a plea of not guilty, with the consent of the accused, given in person, and of the attorney for the Commonwealth, both entered of record, the court, in its discretion, may hear and determine the case, without the intervention of a jury." Under the recent amendment all criminal cases may now be submitted to the court.

██ From this it is entirely clear that the court in misdemeanor cases might, with the consent of the accused given in person, and of the attorney for the Commonwealth, both entered of record, give final judgment without the intervention of a jury. It also appears that there is no provision of law as to the manner in which this may be done beyond that which states that it must be done in person. The form of waiver is not jurisdictional.

██ In *Bowen* v. *Commonwealth*, 132 Va. 598, 602, 111 S. E. 131, 132 (1922), this court, speaking through Kelly, P., said: "In the note found in 9 Ann. Cas. 263, citing numerous cases, it is said: 'In jurisdictions wherein it is held that a jury may be waived by the accused, such waiver may be by a failure on the part of the accused to demand a jury.'" And in the same case, the court said: "The proposition asserted by Chief Justice Shaw, quoted by Mr. Justice Brewer in the *Schick Case, supra* [195 U. S. 65, 24 S. Ct. 826, 49 L. Ed. 99, 1 Ann. Cas. 585], that the accused 'may

waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court,' is undoubtedly a sensible and sound proposition, supported by the great weight of authority." And again: "In *McCue* v. *Commonwealth*, 103 Va. 870, 1006, 49 S. E. 623, Judge Keith, in an opinion refusing a writ of error to a sentence of death, quoted with approval the following from *McKinney* v. *People*, 2 Gilman (Ill.) 540, 43 Am. Dec. 65: 'A prisoner on trial under our laws has no right to stand by and suffer irregular proceedings to take place, and then ask to have the proceedings reversed on account of such irregularities. The law, by furnishing him with counsel to defend him, has placed him on the same platform with all other defendants, and if he neglects in proper time to insist upon his rights, he waives them.' "

In *Griffin* v. *Mills*, 39 N. J. L. 587, 590-591, the court said: "They (the accused) were present at the trial, in person, and were likewise represented by counsel. The case was moved; they made no demand for a jury, but permitted the cause to go on, and were heard through their counsel, without intimating any desire for a jury. After taking the chance of an acquittal by the justice, it is too late now to object to the tribunal. By their conduct they clearly acquiesced in submitting their case to the justice alone. Suppose that the result had been favorable to them on that trial, could the State allege that, for want of a jury, it was no trial, and compel them to submit themselves again to the hazard of a conviction? Clearly not, and if conclusive upon the one side, it must be upon the other." See also *State* v. *Mays*, 24 S. C. 190, and *State* v. *Wiley*, 82 Mo. App. 61.

If Cobb had been acquitted, could it for a moment in reason be contended that he could now be tried and

convicted because he had not consented to submit his case to the judge? Certainly not. What are the facts?

This is the court's order: "This day came the defendants, and on their joint motion, with the consent of the attorney for the Commonwealth, the whole matter of law and fact was heard and determined by the court. Whereupon, it is considered by the court that the said Arthur Lane is not guilty as charged in the said indictment, and that he be acquitted and discharged. And the court reserving judgment in the case of Harry Cobb, takes the matter under advisement."

From bill of exceptions No. 2, it appears that Senator James S. Barron was counsel for the accused. This gentleman stated that he was disappointed and surprised at the refusal of counsel for the Commonwealth to dismiss the prosecution, and at the suggestion of Mr. Wolcott, counsel for Lane, said to the court that a jury would be waived;—"that he did not consult with the defendant, Cobb, about doing this and that the said defendant Cobb never orally or by writing authorized him to waive a jury, or consented orally, or gave his consent to a waiver of a jury by any communication whatsoever, to him, and that in waiving it he acted on his own judgment, and the judgment of his associate without any objection made to him by Cobb."

This is Cobb's statement of what occurred: "When the case was called he was expecting to be tried by a jury; that he knew nothing of any intention to waive a jury, and never heard any suggestion of waiving a jury until he heard Senator Barron declare to the court that the defendants would waive a jury, and that when Senator Barron was speaking to that effect, he called Mr. Wolcott over to himself and informed him that he did not wish to waive a jury, and that Wolcott somewhat brusequely said to him: 'Keep your mouth shut;

your counsel knows better what to do for you than you do;' that being thus advised he kept quiet, and said nothing; that he did not know that he had a right, being represented by counsel, to get up and complain; and that he thought that he was bound to do whatever his counsel said to do in the matter, and that this was why he did not complain at any time during the proceedings; that he was not informed of his right to complain until after the judgment had been entered and he had employed his present counsel, who promptly made the motion herein mentioned."

Mr. Wolcott states that when Senator Barron was waiving the jury, Cobb called him over to where he was sitting and said that he did not wish to make such waiver. Wolcott then said to Cobb: "Oh, keep quiet! Your counsel knows best what to do," or words to that effect, and that nothing more was heard of it.

■ All of this shows that no mistake was made. It shows that Cobb knew that he had a right to a jury trial and desired to exercise that right. This he stated, not to the court, but to his counsel, and after conference, and after being advised that it was to his best interest to waive a jury, acquiesced in that method of procedure, and no protest was made until after the case had been decided against him. He deliberately took his chance with the judge, and having lost he must abide by the judgment. Men may not play fast and loose with courts.

■ We may, in passing, refer to a contention made with some earnestness for the Commonwealth. It is said that the court's order imports verity; that it shows the constitutional requirements were met at the trial and cannot now be questioned.

Bills of exception are also a part of the record, made so by statute (Code, section 6252), and prevail over

recitations in the orders whenever there is any conflict as to facts. *Virginia Hardwood Lumber Co.* v. *Hughes*, 140 Va. 249, 124 S. E. 283; *Johnson* v. *Staley*, 32 Ind. App. 628, 70 N. E. 542.

Here, as we have seen, there was no real conflict, for the accused, after a conference with counsel, and upon reflection, acquiesced in all that was being done and in all that the order states was done.

It is next said that the judgment is contrary to the law and the evidence.

This case was tried by the judge, and his judgment carries with it not only the force of a verdict, but the force of a verdict approved by the trial court. *Rogers* v. *Commonwealth*, 132 Va. 771, 781, 111 S. E. 231, and authorities there cited.

Stress is laid upon the fact that guilt must be established beyond a reasonable doubt, and this no one questions. When a jury has found from the evidence that a defendant is guilty, and when that verdict has been approved by the trial judge, it is not for this court to say that the evidence does or does not establish his guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion. An appellate court is no substitute for a jury. When a jury has been properly instructed, their conclusions must be sustained unless they are contrary to the evidence, or without evidence to support them. This rule obtains with equal force when the entire case is submitted to the judge.

What are the facts? Cobb said that this house had been rented to men whom he did not know. The evidence is that he took the tenants to his rental agent. He said that he had no control whatever over the premises, and yet we find him with a key to the front door. He does not satisfactorily explain what he was

doing at the back door on the occasion of his visit on December 4th. Certainly he would ordinarily be expected to enter by the front door a house in which he was a stranger. Tools were found there such as are used about new Chevrolet automobiles and he had such a car. The concealed trap door leading to the whiskey was disturbed after his visits to the house. He went there with friends, none of whom have testified, and his reputation for crimes of this character is shown to be bad. This is, in itself, an innovation in the law of criminal evidence and shows the fixed purpose of the legislature to get at the bottom of cases of this character.

In the light of all of these incriminating circumstances, can it be said that the judgment is without evidence to support it? We think not, and are of opinion that it should be affirmed, and it is so ordered.

*Affirmed.*