# Wytheville

NEW YORK LIFE INSURANCE COMPANY, A CORPORATION V. ELSTON V. BARTON.

June 11, 1936.

Present, Holt, Hudgins, Gregory, Chinn and Eggleston, JJ.

The opinion states the case.

*William D. Medley* and *R. Aubrey Bogley,* for the plaintiff in error.

*Emery N. Hosmer,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

On January 10, 1928, the New York Life Insurance Company issued to Charles F. Barton its policy for $1,000 with provisions for double indemnity in case of death from bacterial infection in consequence of accidental and external bodily injury. The named beneficiary, Elston V. Barton, wife of the insured, is plaintiff here.

From the policy it appears that there was a premium payment in advance of $10.41. Afterwards payments were to be made semi-annually in the sum of $20.41, beginning on April 4, 1928.

The semi-annual premium due on April 4, 1930, was not paid. On May 28, 1930, the insured was injured, and on June 4, 1930, he died as a result thereof. Payment of this insurance was demanded and refused. The company claimed that the policy for reasons stated had been forfeited. Mrs. Barton contended that there were good and sufficient reasons for this non-payment. Action by way of notice of motion was filed, there was an answer, and in due course the case came on to be heard and was heard on July 12, 1933, as appears from this extract of an order of that date:

"Thereupon the court instructed the jury and after hearing closing arguments of both sides, the jury retired to their room, in custody of the sheriff, and after a time returned into court with the following verdict:

" 'We, the jury, find for the plaintiff the sum of $2,000, with interest from date of death until paid.

" '(Signed)   WILLIAM M. BLUNDELL, Foreman.'

"It is therefore the judgment of the court that the plaintiff recover of and from the defendant the sum of $2,000, with interest thereon from the 4th day of June, 1930, and her costs in this behalf expended.

"Thereupon the defendant, through counsel, moved the court to set aside the verdict on the grounds that the verdict was contrary to law and evidence; and this case is continued for a hearing on the motion to some future date."

Nothing was done until November 16, 1934, when upon further argument this order was entered:

"This cause having come on again to be heard upon the motion of defendant by counsel to set aside the verdict of the jury upon the grounds that the verdict is contrary to the law and evidence, is without evidence to support it, and is against the weight of the evidence, and upon argument of counsel, the court having overruled said motion, to which action of the court, defendant, by counsel, duly excepted, it is by the court,

"Ordered, that judgment be entered, in accordance with the verdict of the jury, against the defendant for the sum of two thousand dollars ($2,000) with interest from July 4, 1930, and costs."

On November 30, 1934, the defendant, by counsel, moved to amend the record and in its motion said:

"Now comes the defendant, by counsel, and moves this honorable court to amend the record of court proceedings in the above entitled cause, recorded on to-wit, the 14th day of July, 1933, in Common Law Order Book No. 15, pages 361, 362, by ordering and directing the clerk of this court to strike out the paragraph reading as follows:

'IT IS THEREFORE the judgment of the court that the plaintiff recover of and from the defendant the sum of $2,000, with interest thereon from the 4th day of June,

1930, and her costs in this behalf expended,' said paragraph appearing as part of the said record on page 362 of the Common Law Order Book as aforesaid, the reasons for said motion being as follows:

"1. That no judgment was entered by the court on the aforesaid 14th day of July, 1933, or at any time until November 16, 1934, as hereinafter set forth, but that when the jury returned a verdict against defendant, said defendant, by counsel, made a motion to set aside said verdict and the case was continued for a hearing on said motion, all of which appears as a part of the record of the above entitled cause.

"2. That the aforesaid paragraph showing entry of judgment against defendant as aforesaid appears as a part of said record solely because of a clerical error of the clerk of the court.

"3. That the aforesaid motion to set aside the verdict of the jury was heard on March 7, 1934, and decided on November 9, 1934, the court denying said motion and on November 16, 1934, the court entered an order entering judgment against defendant in accordance with the verdict of the jury, against the defendant for the sum of two thousand dollars ($2,000) with interest from June 4, 1930, and costs, said entry of judgment appearing as a part of the record in the above entitled cause in Common Law Order Book No. 16 at pages 233, 234."

On December 4, 1934, the prayer of this petition was by order granted. Plaintiff excepted. Motion is now made to dismiss this writ of error because petition filed therefor came too late. It was received on May 15, 1935. If there was a final judgment entered on July 12, 1933, it did come too late. If such a judgment was entered on November 16, 1934, it did not. Code, section 6355, as amended by Acts 1926, ch. 10.

A statute, Code, section 5962, tells us how court records should be kept. "The proceedings of every court shall be entered in a book kept for the purpose to be known as the order book. The proceedings of each day

shall be drawn up at large, and read in open court, by the clerk thereof, at the next session of the said court, except those of the last day of a term, which shall be drawn up and read the same day. After being corrected where it is necessary, the record shall be signed by the presiding judge."

Its purpose being, "to provide for keeping the records of the proceedings of every court correctly, by making it the duty of the clerk to enter them in a book, and to read them in open court to the judge, and in the presence of the bar, so that any errors in or omissions from them might be corrected." *Barnes' Case,* 92 Va. 794, 23 S. E. 784, 785.

In that case the court said:

"The rule at common-law is that during the term wherein any *judicial* act is done the record remains in the breast of the judges of the court and in their remembrance, and therefore the roll is alterable during the term as the judges shall direct; but when the term is past, then the record is in the roll, and admits of no alteration, averment, or proof to the contrary. 3 Thos. Coke. Litt. 323, as quoted in 1 Rob. Pr. (Old Ed.) 638; *Bunting* v. *Willis,* 27 Gratt. [(68 Va.) 144], at pages 158, 159 [21 Am. Rep. 338]; *Winston* v. *Giles,* 27 Gratt. [(68 Va.) 530], at page 534; *Cawood's Case,* 2 Va. Cas. [4 Va.] 527, 545."

In *Richardson's Ex'x* v. *Jones,* 12 Gratt. (53 Va.) 53, there was a judgment by confession. At the following term and on motion this order was entered:

"This day came the plaintiff by his attorney and the defendant withdrawing the plea of payment, said nothing in bar, whereby the plaintiff remains thereof undefended: Therefore it is considered by the court that the plaintiff recover against the defendant."

This was held to be error. The court in the course of its opinion said:

"This writ (*coram nobis*) lies where some defect is alleged in the process or the execution thereof, or some misprision of the clerk, or some error in the proceedings

arising from a fact not appearing upon their face, as where judgment is rendered against a party after his death, or who is an infant or feme covert. *Gordon* v. *Frazier,* 2 Wash. [2 Va.] 130; *Bent* v. *Patten,* 1 Rand. [22 Va.] 25; Tidd's P. F. 513. But it does not lie to correct any error in the judgment of the court, nor to contradict or put in issue a fact directly passed upon and affirmed in the judgment itself. If this could be done there would be no end to litigation, and little security for the titles to property. * * *

"In this case the ground of the motion to set aside the judgment, was that the defendants had not said they could not gainsay the plaintiff's action, as the record stated; and that the entry of judgment thereupon as by confession was through an error of the clerk. It was thus sought directly to contradict the record by evidence *aliunde,* and to prove that what it asserted was not true. This we have seen could not be done. Nor can the error be regarded as a mere clerical misprision. If there were such error it consisted, in the legal sense, in the court's rendering a judgment as by confession, if such was the character of the judgment, where no acknowledgment of the plaintiff's action had been in fact made; and this was a matter not to be put in issue upon a writ of error *coram nobis* or the motion substituted in its place.

"I think therefore the circuit court erred in its order of the 2d of May, 1852, and in proceeding to render a new judgment in lieu of those which it undertook by that order to set aside."

If a court has no power to change a judgment by confession to one *nil dicit,* plainly it has no power to wipe it away. See *Barnes' Case,* 92 Va. 794, 23 S. E. 784. Nor is such power given by Code, section 6333.

If it was intended to give to courts power to set aside all judgments entered at preceding terms, there would have been no occasion to designate instances in which power to correct orders might be exercised. A simple statement to the effect that a judge might make such

changes in preceding orders as seem to him to be right and proper would cover the case. *Thompson* v. *Carpenter,* 88 Va. 702, 14 S. E. 181; *Shipman* v. *Fletcher,* 91 Va. 473, 22 S. E. 458.

■ What is the effect of a motion to set aside a verdict after entry of judgment? Such a motion appears in the order of July 12, 1933. The verdict is merged in the judgment and so such a motion is a vain thing. A motion to set aside the judgment would have been proper and would have suspended it. *Cobb* v. *Commonwealth,* 152 Va. 941, 146 S. E. 270.

■ Neither the court nor the parties proceeded upon the theory that there had been any judgment as of July 12, 1933. The motion to set aside the verdict then made was continued for hearing at some future date. It came on to be heard on November 16, 1934, was fought out upon its merits and won by the plaintiff, for whom a judgment was then entered. That judgment was of course entered at her instance. She should not be heard to say that it amounted to nothing and that she already had been given a proper judgment sixteen months ago. The motion to dismiss is overruled.

This brings before us the case upon its merits, which in turn necessitates a statement of facts, for here as in most cases facts control.

The policy, as we have seen, bears date January 10, 1928. There was paid in advance a quarterly premium of $10.41. Afterwards premiums were to be paid semi-annually, beginning on April 4, 1928, each in the sum of $20.41, and were paid until April 4, 1930. After that date the insured was given a thirty-day grace period, which period expired on May 4th following. It was not paid within the grace period.

■ "Promptness of payment is essential in the business of life insurance. Forfeiture for non-payment is a necessary means of protecting the insurer from embarrassment. Delinquency cannot be tolerated or redeemed

except at the option of the company." Michie's Digest, vol. 5, p. 924. Many cases cited.

If payment be not made, the burden in last analysis falls upon other policyholders. Although promptness may at times be in some manner waived or some principle of estoppel may be invoked, if any of these principles are relied upon, their applicability must be established by the plaintiff.

W. R. Owen was a special canvassing agent of the company and it was through his efforts that this policy was written and delivered. After the default of April 4, 1930, he chanced to meet Barton near the Arlington post office and tells us what then happened:

"I met him near Arlington post office on the walkway. He approached me concerning his premium payment of which he was not so sure he was going to be able to make. I stated to him that if he could not pay the premium, inasmuch as the policy was two years old or more, we would be glad to make a lien note and charge the premium against the policy and keep it in force. He said he did not know that could be done and was glad it could be done and that I should take care of it for him. That happened about midway between the due date and the date of the expiration of the grace period."

Owen did not see Barton again and in fact forgot all about it.

Of course the evidence does not undertake to tell us all that was said during this interview. Barton had never heard of a lien note and the inevitable inference is that Owen told him just what it was, and in any event he knew the value of a note not signed. It was not executed before May 4th and was not executed at all.

Not until the premiums for three years have been paid has this policy any loan or cash surrender value. These values are then respectively $38.00 and $41.00. This cash surrender value is then automatically applied to the payment of temporary insurance:

"In event of default in payment of premium after three

full years' premiums have been paid, the following benefits shall apply:

"(a) Temporary Insurance—Insurance for the face of the policy plus any dividend additions and any dividend deposits and less the amount of any indebtedness hereon, shall, upon expiry of the period of grace, be continued automatically as temporary insurance as from the date of default for such term as the cash surrender value less any indebtedness hereon will purchase as a net single premium at the attained age of the insured, according to the American Table of Mortality and interest at three per cent. This temporary insurance will be without participation in surplus."

It is to be observed that there is no automatic extension until after three years have passed. These policy provisions are not directly challenged, but it is said when two year premiums have been paid the insured has in his policy what is called an equity, which by a long custom of the company can be and frequently is used to prevent forfeiture. As a basis of credit the insured can then give a premium lien note to the company. If this equity equals the note nothing more is necessary to secure the company's acceptance. If it is not enough, then the difference is paid in cash. Here it could carry the policy until January 1, 1931.

The company is anxious to retain its policyholders and it is fair to assume encourages its agents to bring to the attention of those who are embarrassed this method of preventing forfeiture. Sometimes it would fill out these notes and send them to the insured to be signed and sometimes at the request of agents blanks would be furnished to be signed by policyholders and afterwards filled in. But this in every instance had to be done in the grace period, although there were instances in which they were turned in too late to be approved until after the grace period was passed. There is, however, no case on record in which they were presented and accepted unconditionally after that time. The condition in case of such ac-

ceptance being that the company be given a satisfactory health certificate, or that applicant submits to a medical re-examination. In other words, these lien notes are accepted in the place of money. We may for the purposes of this case assume that they were as good as money, but they were not better. A policyholder could, not pay in cash his premium after his day of grace and be reinstated without the same evidence as to insurability required in the case of belated lien notes.

It may be conceded that the company is bound by custom to accept premium notes on two-year-old policies, but a custom relied upon must be accepted in its entirety, and there is nothing to show that it ever unconditionally accepted such notes after the grace period expired. It may further be conceded that a party to a written contract may after its execution waive a provision for his benefit alone.

█ Again much is said about the authority of the insurance agent, and it is true that "The tendency of the courts at the present day is towards a liberal, rather than a strict construction of an agent's power." *Royal Indemnity Co.* v. *Hook,* 155 Va. 956, 157 S. E. 414, 417. But we know of no case in which a soliciting agent for a life insurance company has by virtue of that agency any power to waive a policy provision.

Fire insurance agents receive applications and issue policies. Policies of life insurance are issued by the company.

In Owen's contract of agency this appears:

"Said first party hereby appoints said second party (Owen) its special agent for the purpose of canvassing for applications for insurance on the lives of individuals, and of performing such other duties in connection therewith as the officers of said first party may in writing expressly require of him, and said second party hereby accepts said appointment, upon the following terms, conditions and agreements:

"1st. Said second party shall have no authority for or

on behalf of said first party to accept risks of any kind, to make, modify or discharge contracts, to extend the time for paying any premium, to bind the company by any statement, promise or representation, to waive forfeitures or any of the company's rights or customary requirements, to name any extra premium for extra risks or privileges, or to receive any moneys due or to become due to said first party except upon applications obtained by or through him and then only in exchange for the coupon receipt attached to the application corresponding in date and number with the application and in an amount not exceeding the first premium on the insurance applied for, or except upon policies sent to him by the first party for delivery or renewal receipts signed by an executive officer of the first party and sent to him by the first party for collection, and then only in the amount of the premium stated in the policy or renewal receipt."

There is nothing to show that Owen undertook to exceed these limitations of power. There were no extensions of credit. He did undertake to secure for the insured the acceptance of a premium note in accordance with the company's custom. That custom and its limitations we have considered.

██ It is true that the court did tell the jury in an instruction not excepted to that this agent might extend credit to a policyholder if authorized by custom, and since this instruction was not excepted to it is argued that it is the law of the case. But evidence of this custom had been excepted to, and it is not necessary that error may be twice committed to make it available. Here, however, as we have indicated, there is no proof of any custom upon which a recovery can be based.

Very much in point is the case of *Slocum* v. *New York Life Insurance Co.*, 228 U. S. 364, 33 S. Ct. 523, 527, 57 L. Ed. 879, Ann. Cas. 1914D, 1029, where the court said:

"Under the terms of the policy, as qualified by the practice of the company, the agent was without authority to waive full and timely payment of the premium, save as

he could adjust the payment conformably to the blue note plan. His authority turned upon the giving of the note, which was a matter of real substance, and not of mere form, as is shown by the terms of the note, before quoted."

In the case at bar, not only was it necessary that the premium note be accepted but its acceptance made necessary changes in the dates on which premiums thereafter must be made, and it was also necessary that an agreement to this change in dates of payment be evidenced by a writing signed by the company and by the assured. Both parties must assent.

As shown in Barton's attitude, it is interesting to note that seven days before the grace period expired notice was sent to him that payment must be made to the company at its Washington office. On May 12th following another notice was sent, telling him that his policy had lapsed and that his premium was due. Attached to it was an application of reinstatement which called for a health certificate and a like notice was again sent to him on May 26th. To none of them did he pay attention.

For reasons stated this case must be reversed and final judgment entered for the defendant.

*Reversed.*