# COURT OF APPEALS OF VIRGINIA

---

### Record No. 0017-25-2

---

SHON DE-MARIO BLOOMFIELD

v.

COMMONWEALTH OF VIRGINIA

---

Present: Judges Beales, O'Brien and Ortiz

Argued at Richmond, Virginia

Opinion Issued June 9, 2026[*]

---

### FROM THE CIRCUIT COURT OF HENRICO COUNTY
Richard Strouse Wallerstein, Jr., Judge

Ryan C. Weir (Rachel L. Yates; Law Office of Rachel Yates, PLLC; Yates Appellate Law, on briefs), for appellant.

Matthew J. Beyrau, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

### MEMORANDUM OPINION BY
### JUDGE RANDOLPH A. BEALES

Following a jury trial in March 2023, the Circuit Court of Henrico County convicted Shon De-Mario Bloomfield of possessing a firearm as a convicted felon. The trial court also declared a mistrial on one count of first-degree murder and one count of using a firearm in the commission of a felony because the jury could not reach a unanimous verdict on those two counts. The Commonwealth then retried Bloomfield on those two charges in May 2024. After a second jury trial on May 7-9, 2024, the Circuit Court of Henrico County convicted Bloomfield of second-

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

degree murder in violation of Code § 18.2-32 and using a firearm in the commission of murder in violation of Code § 18.2-53.1.

## I. BACKGROUND[2]

Karen Molina-Guzman (Molina) testified at both the first and second jury trials.[3] She testified that in December of 2021, she was living in the Wistar Village Apartments. On December 28, 2021, from the window of the kitchen in her apartment, she saw two people walking from Wistar Village Drive towards the dog park. She recalled that "one of them was dressed in black and the other one had a white jacket." Molina indicated that the two people were walking next to each other and "the one that was dressed in black" moved his hands in a gesture with his palms up. She testified that the two people then stood facing each other, and the person in the white jacket shot the person in black. Molina explained that, before the shooting, "a third person came out of the apartment on the right hand side." She testified, "And when the person arrived, he got closer to these two people. That's when they shoot and the two of them run away." Molina recalled that the man in the white jacket made a movement with his hand, and she demonstrated that movement during her testimony. The circuit court judge described Molina's motion as "[s]traightened her arm and pointed her right hand downwardly."[4] Counsel

---

[2] "Under the applicable standard of review, this Court views the evidence in the light most favorable to the Commonwealth, as the prevailing party below." *Park v. Commonwealth*, 74 Va. App. 635, 643 n.2 (2022). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

[3] The evidence presented at the first and second jury trials was largely the same, but Carlton Bloomfield testified only at the second jury trial.

[4] Both the counsel for the Commonwealth and Bloomfield's counsel agreed with the judge's description.

for Bloomfield asked, "You never saw a gun in anybody's hand, right?" Molina responded, "Exactly. I didn't see one weapon."

Josiah Evans, who was an off-duty police officer at Virginia Commonwealth University, also testified at both of the jury trials. He testified that on December 28, 2021, he was working out in "the clubhouse at Wistar Village." He recalled, "I got a phone call from my girlfriend stating that she heard a shooting." He left the clubhouse to go back to his apartment where his girlfriend was located. He explained, "When I exited the facility I saw a whole bunch of people coming out of their apartments. People looking towards the dog park." Evans "continued walking" and "got to the dog park in which I saw a victim on the ground." Evans testified that he performed CPR on the victim, later identified as Anthony Sweat, and helped the officers keep the scene clear of bystanders.

Ramona Harris, Sweat's girlfriend, testified at both jury trials. She identified Bloomfield and referred to him as "Bloom." She explained that on December 28, 2021, she and Sweat were going to use the gym at Bloomfield's apartment. She drove Sweat's white Dodge Charger to the apartment complex, and Sweat rode in the passenger seat. Harris testified that she parked on the street and that she and Sweat waited until "[h]e got out of the car and crossed the street." Harris recalled that she did not watch the men or see where they went, and the next thing she remembered were gunshots. She identified Sweat on a video recording—from a Ring doorbell camera—which the Commonwealth entered into evidence.

She testified that she heard "[a]bout four" gunshots. She recalled, "I didn't do anything until my phone rang." She testified that Sweat was calling but that there was no response when she answered the call. She testified, "It just hit me that something wasn't right at that point. And [I] drove the car to a parking lot and I can see people[] kind of standing, and I walked up and I saw Anthony [Sweat] laying on the ground." Harris continued, "I was trying to get to him but

someone was stopping me." She recalled, "I got in the car and I called my mom and my sister." She then went home.

Angela Armstead, Bloomfield's girlfriend, also testified at both trials. Armstead testified that in December of 2021, she lived in the Wistar Village Apartments. She explained that Sweat came to her apartment on December 27, 2021, and "[h]e was looking for Shon [Bloomfield]."

Armstead testified that she heard gunshots on the next day, December 28, 2021, at the Wistar Village Apartments. She recalled that later that day, Bloomfield came over to her apartment around dinner time, "about six or seven." Armstead testified that she later found out that Sweat was the one who had been shot, and "I remember [Bloomfield] telling me that he didn't do it." She further testified that Bloomfield seemed surprised when she told him that Sweat was the one who had been shot.

Detective Kenneth Hill of the Henrico County Police Department testified at both jury trials. Detective Hill testified that he found a Verizon flip phone on the ground next to Sweat, and he found an iPhone "in the victim's left jacket pocket." He also recalled, "We found a Smith and Wesson M&P .45 caliber pistol in his right jacket pocket. It was zipped closed." Detective Hill also found four cartridge cases for a nine-millimeter firearm.

Dr. Jeffrey Gofton, the assistant chief medical examiner for the Commonwealth of Virginia, testified at both trials because he performed the autopsy of Sweat's body. Dr. Gofton observed a total of four gunshot wounds on Sweat's body, including a gunshot wound to the head underneath the eye and two gunshot wounds to the chest. He testified that there was intermediate stippling around the gunshot entrance wound on Sweat's right eye indicating that the gun was fired "from several inches to several feet away from the body." Dr. Gofton recalled, "There was no stippling or soot deposits with any of the other gunshot wounds." He further testified, "The cause of death was gunshot wounds to head and torso."

Stephen Atkinson from the Department of Forensic Science Central Laboratory testified as an expert in firearm and tool mark identification at both jury trials. He analyzed the bullets recovered from Sweat's body and the cartridge cases found around the area of Wistar Village Apartments where Sweat was killed. Atkinson testified, "[T]he three bullets and the one bullet jacket that were submitted were all fired from the same firearm." Atkinson also testified that the cartridge cases were all fired from the same firearm.

Carlton Bloomfield ("Carlton") testified only at Bloomfield's second jury trial.[5] Carlton testified that on December 28, 2021, he went with Bloomfield to the Wistar Village Apartments, where Bloomfield's girlfriend lived. Carlton explained that they parked the car, and he walked to a park area and "I sat on the bench, with an old man and his dog, and [his] grandson." Carlton recalled, "I heard a commotion, I just looked down and he was down over there, just in general talking. It wasn't nothing else." Counsel for the Commonwealth asked, "what do you mean by you heard a commotion?" Carlton responded, "Voices getting loud." Carlton explained that he saw Bloomfield and another "dude" talking and arguing. Carlton recalled, "I just turned back around" and then added that "about a few minutes later, I heard a gunshot and when I heard the shot, I ran." When asked, "Did you shoot Anthony Sweat," Carlton Bloomfield responded, "No." He also testified that he did not have a gun that day.

Carlton also testified that he had initially lied to the police by denying that he was in the area on that day. He confirmed that he was not truthful when he testified in front of a multi-jurisdictional grand jury when he stated that he was not there on the day of the murder. He explained that he had been charged with perjury and that he was telling the truth now at Bloomfield's second jury trial.

---

[5] Carlton Bloomfield is Shon De-Mario Bloomfield's uncle.

The appellant Shon Bloomfield testified in his own defense at both jury trials. At the first jury trial Bloomfield testified, "I met Anthony [Sweat] when I was in the penitentiary at Green Rock." When asked about Sweat at the second jury trial, Bloomfield testified:

> We were doing several different businesses together. We started out doing the marijuana thing. We were selling drugs together. But at the time, I was trying to introduce him to getting into a trucking hauling company that I had. So I was trying to bring him to the other side as far as trying to do something with the money on a positive side.

Bloomfield watched the video footage from the Ring doorbell camera and identified himself as the man in the white jacket. He also identified the man in black as Anthony Sweat and confirmed that he was the man in the Ring camera video speaking to Sweat—four minutes before the first 911 call.

Bloomfield said that Sweat was concerned about a car parked on the street of the apartment complex and he pulled out a gun. After Sweat put the gun away, he and Sweat started walking towards the apartment gym. Bloomfield testified that Carlton approached them, and Carlton and Sweat started talking back and forth. Bloomfield recalled, "At this point him and Anthony are, they fell a little bit behind me, I may be a good step or two in front of them as we continue to walk," and then "I hear a gunshot." Bloomfield recalled that he then started to run and he heard more gunshots. Bloomfield testified that he did not have a gun that day.

In addition, Bloomfield testified that he owed Sweat $4,850, which included "around twelve hundred" that he owed Sweat personally. Bloomfield recalled, "Anthony [Sweat] didn't have CashApp. He had Apple Pay. So a lot of times when people may have some money for him, they would have CashApp." Bloomfield further explained, "I would give him my CashApp account and they would send the money to me. I would draw it off or however, and I would give it to him." Bloomfield's counsel asked, "Now, there's a text message exchange about three hundred dollars, being short three hundred dollars." Bloomfield explained that Sweat texted him

- 6 -

about $300 which Bloomfield had received on CashApp and withdrew in cash, but Bloomfield explained that he had the $300 to give to Sweat.

After the Commonwealth presented its case in chief at the first jury trial, Bloomfield's counsel made a motion to strike the evidence arguing (1) that the Commonwealth did not bear its burden of proving that Bloomfield was the shooter—and arguing (2) that the evidence was inadequate to show that Bloomfield possessed a firearm. The trial court denied the motion to strike, and Bloomfield testified in his own defense. At the end of the first trial, the jury found Bloomfield guilty of possessing a firearm as a convicted felon, but the jurors were unable to reach a unanimous verdict on the other charges. In May 2024, the Commonwealth retried Bloomfield on the two remaining charges of first-degree murder and using a firearm in the commission of murder.

After the Commonwealth presented its case in chief at the second jury trial, Bloomfield's counsel made a motion to strike the evidence, and he argued that the Commonwealth did not prove premeditation and that the Commonwealth did not prove that Bloomfield was the shooter. The trial court again denied Bloomfield's motion to strike.

After putting on his own evidence, Bloomfield's counsel renewed his motion to strike the evidence, and the trial court again denied the motion. The jury found Bloomfield guilty of second-degree murder and using a firearm in the commission of murder. Counsel for Bloomfield then filed a motion to set aside the verdict, which the trial court denied in its sentencing order. Bloomfield now appeals to this Court.

## II. ANALYSIS

"When faced with a challenge to the sufficiency of the evidence supporting a criminal conviction, an appellate court is faced with the limited task of determining 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

*Cuffee v. Commonwealth*, __ Va. __, __ (Apr. 16, 2026) (emphasis in original) (quoting *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024)). "This appellate inquiry begins with the presumption that the decision in the circuit court is correct and cannot 'be disturbed unless it is "plainly wrong or without evidence to support it."'" *Id.* at __ (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). In short, as this Court has frequently stated, "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

This Court has stated, "In assessing the evidence, this Court is mindful that '[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify.'" *Bennett v. Commonwealth*, 84 Va. App. 607, 619 (2025) (alterations in original) (quoting *Maust v. Commonwealth*, 77 Va. App. 687, 702 (2023) (en banc)). "The trier of fact is 'free to believe or disbelieve, in part or in whole, the testimony of any witness.'" *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (quoting *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc)). "This principle further permits the jury 'to disbelieve the self-serving testimony of the accused and to conclude that [he] is lying to conceal his guilt.'" *Bennett*, 84 Va. App. at 619-20 (alteration in original) (quoting *Washington*, 75 Va. App. at 616).

A. Second-Degree Murder and Use of a Firearm in the Commission of Murder

On appeal to this Court, Bloomfield argues, "The trial court erred in denying Bloomfield's motions to strike his Virginia Code §§ 18.2-32 and 18.2-53.1 charges and in denying his motion to set aside the verdicts because the evidence was insufficient as a matter of law to sustain the convictions." Bloomfield further argues, "Eyewitness testimony was contradictory," and he states, "While Bloomfield testified and acknowledged that he was present wearing a white jacket, the differences in basic facts between the Commonwealth's witnesses highlight how unreliable such witnesses can be."

Code § 18.2-32 states, "All murder other than aggravated murder and murder in the first degree is murder of the second degree." Code § 18.2-53.1 states, "It shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit murder."

Molina testified that she saw the man in white fire a shot at the other man. Although she did not see a weapon, she specifically testified that the person in white fired the shot at the other person who was wearing black. When repeatedly questioned about who was the shooter, Molina reiterated, "I saw when the one that was dressed in white did it." During her testimony, Molina demonstrated the movement made by the man in white, which the circuit court judge described as "[s]traightened her arm and pointed her right hand downwardly," and both counsel for the Commonwealth and counsel for Bloomfield agreed with that description. A rational factfinder could conclude that the motion that Molina testified that she saw was the firing of a shot by the man in white—Bloomfield confirmed he was wearing the white jacket—at the man in black, who was identified as Sweat.

Furthermore, Bloomfield admitted that he was the man in a white jacket speaking with Sweat in the security camera video that was taken only four minutes before the first 911 call

- 9 -

reporting the shooting. Bloomfield also confirmed that he was present when Sweat was murdered and that he was still wearing the white jacket. Dr. Gofton testified that there was intermediate stippling around the wound on Sweat's right eye and that a wound with intermediate stippling could have been made "from several inches to several feet away from the body." Thus, the shooter had to be in very close proximity to Sweat, and Bloomfield confirmed in his testimony that he was still near Sweat at the time Sweat was shot.

Bloomfield also had a motive to kill Sweat. Bloomfield testified that he owed Sweat $4,850. Bloomfield explained, "Some of it was money that I personally owed for something I got from him, but the majority of it was money that I was collecting from other people [for] him."

Bloomfield points to his own testimony and argues that the conflicting testimony of his uncle, Carlton Bloomfield, was not credible. The jury was "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Washington*, 75 Va. App. at 616 (quoting *Bazemore*, 42 Va. App. at 213). The jury had "the unique opportunity to observe the demeanor of the witnesses as they testif[ied]." *Bennett*, 84 Va. App. at 619 (quoting *Maust*, 77 Va. App. at 702). Indeed, the jury was permitted to "disbelieve the self-serving testimony of the accused and to conclude that [he] is lying to conceal his guilt." *Id.* at 620 (alteration in original) (quoting *Washington*, 75 Va. App. at 616).

Based on all of the available evidence, and viewing that evidence in the light most favorable to the Commonwealth as the prevailing party below, we certainly cannot say that no rational factfinder could find beyond a reasonable doubt that Bloomfield was the person who shot and killed Anthony Sweat.

B.  Possession of a Firearm by a Convicted Felon

Bloomfield also argues, "The trial court erred in denying Bloomfield's motion to strike his Virginia Code § 18.2-308.2(A) charge because the evidence was insufficient to prove that Bloomfield knowingly and intentionally possessed a firearm."

Code § 18.2-308.2(A) states, "It shall be unlawful for (i) any person who has been convicted of a felony. . . to knowingly and intentionally possess or transport any firearm or ammunition for a firearm."  As noted *supra*, the evidence was sufficient to convict Bloomfield of using a firearm in the commission of murder.  Molina testified that she saw the man in the white jacket (who was Bloomfield) fire a shot at the man in black (who was Sweat).  Indeed, the jury was "free to believe or disbelieve, in part or in whole, the testimony," and the jury could credit Molina's testimony that Bloomfield, who is a convicted felon, possessed a firearm.  *Washington*, 75 Va. App. at 616 (quoting *Bazemore*, 42 Va. App. at 213).  Thus, the evidence was also clearly sufficient to convict Bloomfield of possession of a firearm as a convicted felon.[6]

III.  CONCLUSION

For all of the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*

---

[6] Bloomfield also asserts, "Apart from the evidence of murder, the only other evidence of Bloomfield possessing a weapon is from his candid acknowledgement that he had been around guns a month prior to the shooting."  Bloomfield essentially argues that the evidence was insufficient to "support the charge as alleged" in the indictment, which specified the date "[o]n or about December 28, 2021."  Because the evidence was sufficient, however, to support Bloomfield's conviction for possession of a firearm on or around the date stated in the indictment, this Court simply does not need to determine whether the indictment was also sufficient to support a conviction based on Bloomfield's possession of a firearm during the month before the murder.  *See Thomas v. Commonwealth*, 303 Va. 188, 198 (2024) ("The doctrine of judicial restraint dictates that generally we decide cases 'on the best and narrowest grounds available.'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).