COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Ortiz, Chaney and Senior Judge Haley
Argued at Richmond, Virginia


PATRICK D. GOLDY

                                                        MEMORANDUM OPINION* BY
v.        Record No. 0557-22-2                         JUDGE JAMES W. HALEY, JR.
                                                              AUGUST 1, 2023

COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF LOUISA COUNTY
                        Timothy K. Sanner, Judge

          (Reed C. Amos; Amos & Amos, PLLC, on brief), for appellant.
          Appellant submitting on brief.

          Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
          Attorney General, on brief), for appellee.


        This case involves the sexual abuse of a nine-year old girl (the child) by a member of her

extended family.  Relying on the sharply contrasting accounts of the child's family members and

some inconsistencies between her trial testimony and prior reports, Patrick D. Goldy challenges his

convictions for two counts of aggravated sexual battery against a victim less than 13 years old.

Goldy argues that the child's account was inherently incredible, a circumstance which "fatally

undermined the convictions."  We affirm the convictions because the jury, whom the law entrusts to

resolve such conflicts, reasonably credited the child's account.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

On June 23, 2020, then 26-year old Goldy moved into the Louisa County home of his foster-sister, Ashley Elder, and her husband Scott. During June and July 2020, Ashley babysat the child and the child's younger siblings in her home while their mother, Ashley's sister-in-law,[2] was at work. Ashley worked remotely from her home office, and the child's mother felt that Ashley was able to supervise and provide for her "very" "independent" children. It was uncontested that Ashley's home office was situated so that she could only see into the living room and kitchen if she stood in the doorway. Ashley had instructed the children not to interrupt her while she worked. Given Ashley's work obligations, it was "common" for the child to be in Goldy's company unattended, either in the living room or kitchen.

On September 3, 2020, the child tearfully reported to her mother that Goldy had fondled her buttocks and vagina the last time she had been at Ashley's home, sometime in July 2020. The child's mother called Ashley and Scott to advise of the child's report and then she called the police.

A sheriff's deputy went to the family home on the night of the report. Detective Mills took over as lead investigator in the case on September 6, 2020. Detective Mills interviewed the mother and attended the child's forensic interview on September 14, 2020. Detective Mills called Goldy, who was then in Florida, and asked him to return to Virginia for an interview. Goldy told Detective Mills that he did not have money and that he would return when he received his Social Security check in early October. Goldy did not return as promised, and his attorney subsequently contacted

---

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Under this deferential standard, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] Ashley's older brother is married to the child's mother.

- 2 -

Detective Mills and told him not to speak with his client. Goldy was arrested in March 2021 and did not return to Virginia until June 2021. A grand jury indicted Goldy for two counts of aggravated sexual battery.

At Goldy's jury trial, the child testified that she initially enjoyed staying at Ashley's house and considered Goldy her friend. She recalled that Goldy was with her and her siblings "most of the time" because Ashley was in her office working. The children were not permitted to talk to Ashley when she was on the phone, which was often. Instead, Goldy played with the children or watched television with them; sometimes he made them lunch.

On the last day that Ashley was babysitting the children before they changed daycare arrangements, Goldy came and sat next to the child on the living room couch. Goldy then "put his hands" down the child's pants "in the back of [her] underwear, and he touched [her] in [the] bottom of [her] crack." The child turned over. Goldy remarked, "[O]h, no, something is happening" and moved a blanket away to reveal "his private" "sticking up" under his shorts. The child recounted that Goldy then "put his hands in the front of my pants and my underwear, and he started to feel around . . . where I go to the bathroom." The touching lasted for about ten seconds until the child "kicked" Goldy, got up from the couch, and went into the kitchen. She did not tell Ashley what Goldy had done because Ashley was on the phone and the child was scared. The child reported the abuse to her mother on September 3, 2020.

The family had been close and "did everything together" before the child's disclosure. The child's mother had helped Goldy move into Ashley's home, and she also "spent a lot of time" in the home. It was common for Goldy to be in the living room or the kitchen with her children unattended. The mother explained her expectations of Ashley while she was babysitting were that the children would be "fed and safe," supervised "to some extent" and that Ashley would not leave the children in the home alone with Goldy. She considered that the children were being supervised

even while Ashley was in her home office but noted that Ashley "can't see through walls." The mother stated that the children were not locked in a room on their own and she would not have agreed to such an arrangement. The mother considered her children "safe" if they had toys or the television to occupy them. The children stopped going to Ashley's house at the end of July because she did not have the capacity to homeschool them, so the mother made different childcare arrangements.

In August 2020, the family went to the beach together. Several family members had to direct the child to stop jumping on Goldy after he asked her to stop. The family, including the child, also attended a rally called "Freedom for Children" in August, where people spoke about child sex abuse and trafficking. The child was playing on the playground with her siblings while the speakers presented. At trial, the child did not recall what the speakers had said.

The child reported Goldy's actions to her mother in September after she was told that her mother had to work late the following evening, so the children would go to Ashley's house and their mother would pick them up. The child approached her mother and said that she did not want to go to Ashley's house. When asked why she did not want to go to Ashley's house, the child told her mother that Goldy had touched her the last week she had been at Ashley's house. The child was "very upset," "crying and hysterical." As the mother recalled, the child reported that Goldy "touched her" in "the back" first and then "touched her in the front" "[u]nder her underwear." He also commented to the effect of "look what's happening" while looking at his crotch.

In his defense, Goldy called Mayra Cardenas, from the Foothills Child Advocacy Center, who interviewed the child on September 14, 2020. Cardenas testified that the child stated during the interview that Goldy first touched her in the front of her pants, then she turned and Goldy touched her in the back—both times over her underwear. The child denied that Goldy said anything "when he touched [her]" on the crotch or bottom. But Cardenas confirmed that the child reported

- 4 -

that Goldy touched her "under her pants" in her genitalia in front. She also said Goldy touched her "on [her] backside" "[u]nder her pants."

Ashley and Scott also testified for the defense. Both stated that when they confronted Goldy about the child's allegations he denied touching the child. Goldy assured Scott, "I would never touch a kid." Scott and Ashley also testified that the mother and Ashley's brother often discussed, sometimes in the child's presence, that Goldy's father was a pedophile and their belief that pedophilia was hereditary. Given that belief, Ashley's brother insisted that while the children were with Ashley and Scott, they either had to supervise the children or keep them in the office or their bedroom away from Goldy.

In contrast to the mother and child's accounts, Ashley testified that she did not have direct customer contact in her job and worked from a spreadsheet; she was only on a work call one hour per week. The child and her sister often played in her office while she was working, which was not a problem. Ashley only babysat the child on six, non-consecutive days in July, when her mother needed help. The last date she babysat the child was July 17, 2020. After Goldy moved in, the child and her sister stayed either in Ashley's bedroom or the office because Ashley's brother said that Goldy was not allowed to be alone with the children. The child was never out of her sight in Goldy's presence; she remained in Ashley's bedroom with the door closed or in Ashley's office. If the child went to the kitchen to get a drink, Ashley "st[oo]d at the end of the hallway to watch" her until she returned to the office or bedroom. According to Ashley, Goldy was "never alone with the kids."

Scott recalled an incident on July 2, 2020, when the child spent the night with them. The child and Goldy sat together on a couch. The child moved closer to Goldy and "tried throwing a blanket around him." Scott scolded her that her behavior was inappropriate and directed her to stay on the other side of the couch. The child later told Scott that she did not like Goldy being at the

- 5 -

house because she had to stay in the bedroom with her sister and watch the television shows that her younger sister chose.

The jury convicted Goldy on both counts of aggravated sexual battery. The trial court subsequently sentenced him to a total of 40 years' incarceration with 34 years suspended.

Goldy appeals his convictions, arguing that the evidence was insufficient to support his convictions because the Commonwealth's evidence "proved inconsistent and exhibited conflicting testimonies at trial that proved inherently incredible." Goldy contends that the Commonwealth's prosecution "hinged on" the child's testimony, which was uncorroborated and "inconsistent." Additionally, Goldy emphasizes that the child delayed reporting the assault to her mother and had "a motive to fabricate" the allegation. He further points to his denial of the allegation and Ashley's testimony that he was "never" alone with the child.

## ANALYSIS

Under settled precedents, "we review factfinding with the highest degree of appellate deference." *Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015)). "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Barney*, ___ Va. at ___ (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

"It has long been deemed 'an abuse of the appellate powers . . . to set aside a verdict and judgment, because [an appellate court], from the evidence as written down, would not have concurred in the verdict.'" *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018) (alterations in original) (quoting *Hill v. Commonwealth*, 43 Va. (2 Gratt.) 594, 602 (1845)). "The only 'relevant question [on appellate review] is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Barney*, ___ Va. at ___ (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

"[D]etermining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact." *Brown v. Commonwealth*, 75 Va. App. 388, 413 (2022) (alteration in original) (quoting *Parham v. Commonwealth*, 64 Va. App. 560, 565 (2015)). "[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Id.* (alteration in original) (quoting *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002)). "Such deference stems, in part, from the [jury's] 'opportunity to observe the testimony and demeanor of all witnesses.'" *Meade v. Commonwealth*, 74 Va. App. 796, 805 (2022) (quoting *Lopez v. Commonwealth*, 73 Va. App. 70, 81 (2021)).

"Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "The mere fact that a witness may have delayed in reporting knowledge of a case or given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper*,

271 Va. at 415. "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). Such circumstances are "appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine." *Juniper*, 271 Va. at 415.

Goldy first notes that there were no witnesses to the abuse and no physical evidence to corroborate the child's account. It is well established, however, that convictions for "sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005)); *see also Nobrega v. Commonwealth*, 271 Va. 508, 519 (2006) (same). "[B]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Poole*, 73 Va. App. at 369 (quoting *Wilson*, 46 Va. App. at 88).

The record does not support a conclusion that the child's testimony was inherently incredible. Although Goldy highlights inconsistencies between the child's trial testimony and some of the statements she made during the forensic interview, none of the discrepancies he notes was material to the offense. On the material elements of the offense, the child "did not waiver" in her account. *Nobrega*, 271 Va. at 518. Indeed, Cardenas confirmed that the child reported to her during the forensic interview that Goldy touched her "under her pants" in her genitalia and on her backside "[u]nder her pants." Whether Goldy touched the child's genitalia or her bottom first does not make the child's otherwise clear account inherently incredible. Similarly, whether Goldy touched the child over or under her underwear, he was guilty of aggravated sexual battery. *See* Code §§ 18.2-67.3, 18.2-67.10(6)(a). Finally, we do not find that the child's account of Goldy's statement calling attention to his obvious erection (and thus establishing the requisite intent), was necessarily inconsistent with what she told Cardenas. The record indicates that

- 8 -

Cardenas asked the child if Goldy said anything to her "when" he touched her. The child's testimony concerning the timing of the statement was ambiguous, and she stated that "he didn't say anything" else. Thus, a rational juror could conclude that Goldy did not say anything "when" he touched her bottom or her genitalia.

Next, Goldy points to the child's delayed report of the abuse as a circumstance rendering her testimony incredible as a matter of law. The incident occurred in July 2020, and the child reported it to her mother on September 3, 2020. Our cases recognize that a "victim's youth, fright and embarrassment certainly provide[ ] the jury with an acceptable explanation for [delayed reporting of sexual assault]." *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991). *See also Wilson*, 46 Va. App. at 88 (holding that 12-year old victim's delayed report due to her fear of the defendant and "shame and embarrassment at what was happening to her" was consistent with human experience); *Love v. Commonwealth*, 18 Va. App. 84 (1994) (holding that 13-year-old victim's 7-year delay in reporting ongoing sexual abuse did not render her testimony inherently incredible). The child explained that she did not immediately report the abuse to Ashley because Ashley was working and she was scared. The report was precipitated by the child's fright at the thought that she had to return to Ashley's house the next day, where Goldy would be present. The jury reasonably could have found her delayed report reasonable in light of her age, fear, and embarrassment. *Corvin*, 13 Va. App. at 299.

Goldy also argues that the child's behavior toward him after the abuse but before the disclosure was "contrary to her allegations." Specifically, he notes that the child was "jumping" and "climbing" on him while they were on the family beach trip. It is not contrary to human experience that the child may have had ambivalent feelings toward someone whom she had considered a friend before the abuse. The jury may have reasonably concluded that the child felt comfortable in Goldy's presence when the other adult family members were present.

- 9 -

Goldy raises additional arguments based on evidence that the jury necessarily rejected in reaching its verdicts. His arguments concerning the child's alleged motive to fabricate her accusation, his lack of opportunity to commit the offenses, and the child's exposure to her parents' conversations that he was a pedophile must fail because they are inconsistent with the governing standard of review. Simply put, the child's testimony was not rendered "inherently incredible" merely because of her aunt and uncle's contradictory testimony. *Cornell v. Commonwealth*, 76 Va. App. 17, 31 (2022). Finally, Goldy notes Scott and Ashley's testimony that he denied the child's allegations when confronted with them. But the jury was not required to credit his self-serving denials. *Cf. id.* at 30; *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998) ("In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt.").

Assessing witness credibility was the task of the jury, which was "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Cornell*, 76 Va. App. at 31 (quoting *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc)). "'[T]he living record contains many guideposts to the truth which are not in the printed record,' and an appellate court, not having the benefit of these guideposts, 'should give great weight to the conclusions of those who have seen and heard them.'" *Hamilton v. Commonwealth*, 69 Va. App. 176, 190 (2018) (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 526 (2015)); *Dean v. Morris*, 287 Va. 531, 537 (2014) (same). The record supports the jury's credibility determination.

## CONCLUSION

The child's testimony was not inherently incredible, and the evidence supported the jury's verdicts of guilt. Accordingly, we affirm the trial court's judgment.

*Affirmed.*