COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Athey, Causey and Chaney

JAMIR WALLACE, SOMETIMES KNOWN AS
 JAMIR HASSAN WALLACE
                                                    MEMORANDUM OPINION*
v.        Record No. 0223-24-1                          PER CURIAM
                                                    SEPTEMBER 16, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
David W. Lannetti, Judge

(James S. Panagis, Jr.; Wolcott Rivers Gates, on briefs), for
appellant.

(Jason S. Miyares, Attorney General; Robert D. Bauer, Assistant
Attorney General, on brief), for appellee.


Jamir Hassan Wallace appeals his convictions, following a bench trial, for rape, forcible

sodomy, and impersonation of a law enforcement officer. Wallace argues that the trial court

erred when it "incorrectly interpreted cases from [t]his Court defining the scope of what qualifies

as 'intimidation' under the [r]ape and [f]orcible [s]odomy statu[t]es and used that inaccurate

analysis to find sufficient intimidation." Wallace also argues that the evidence generally was

insufficient to support his convictions. We disagree, and affirm the convictions.[1]

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Having examined the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the facts and legal arguments are adequately presented in
the briefs and record, and the decisional process would not be significantly aided by oral
argument." *See* Code § 17.1-403(ii)(c); Rule 5A:27(c).

BACKGROUND[2]

On February 13, 2022, C.R.[3] allowed a friend who was living with her to use her car to go grocery shopping at Harris Teeter. While leaving the supermarket, the friend realized she had forgotten something in the store. The friend drove the car closer to the store's entrance, exited the car, left the keys in the ignition, and reentered the store. The car was stolen almost immediately. The incident occurred around 5:00 p.m. and upon learning that the car had been stolen, C.R. went to the store.

There was confusion about whether C.R.'s friend had already filed a police report, so C.R. waited for officers to arrive. Wallace, an unarmed Harris Teeter security officer, informed C.R. that he was an off-duty police officer. Wallace wore a black hat and black vest with "Armed Enforcement" embroidered on them, a security belt, and khaki pants. Wallace claimed that his co-worker had informed him a police report had not been filed and offered to expedite the police's arrival.

While waiting for officers to arrive, Wallace and C.R. talked in the store and then near Wallace's truck during his work break. At some point, Wallace showed C.R. security footage of her car's theft on his phone. C.R. asked Wallace to send her the footage so that she could give it to police. Wallace initially refused, stating it was against Harris Teeter's protocols. Eventually, however, Wallace agreed to send C.R. the footage. To do so, Wallace asked for C.R.'s phone, which C.R. unlocked and handed to him. Wallace then walked away from C.R. and returned

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[3] We use initials, instead of the victim's name, to protect her privacy.

with her phone minutes later. C.R. noticed that Wallace had texted the message "Hi" from her phone to his and that he responded to that text message with the security footage.

At some point, C.R. confirmed that police officers would meet her at her home to finish the police report. While at Wallace's truck, C.R. informed Wallace that she was going home. C.R. noted that Wallace had a computer in his truck.

Around 9:00 p.m., Wallace called C.R. and informed her that "there's some stuff [she] need[ed] to know about the people that were staying with [her] and that he needed to talk to [her] in person." Wallace then asked for C.R.'s address, which she texted to him. At 10:11 p.m., Wallace called C.R. again, saying he was on his way to her residence.

When Wallace arrived, he was still wearing a security belt, vest, and "some sort of a law enforcement badge on his shoulder." C.R. could not recall any differences between what he wore at Harris Teeter and what he wore to her house. Wallace told C.R. that "he was off duty" while he was working security for Harris Teeter, but he "was on duty now and that the people [who] were staying with [her] had actually shoplifted [at] the Harris Teeter and that he was there to bring them in." Wallace then asked C.R. where her roommates were, where her man was, and where her room was. When C.R. stated that her room was at the end of the hall, Wallace ordered her to "[g]o to [her] room." She said, "[n]o[,] [n]o," thinking Wallace was about to go arrest her friends upstairs but Wallace insisted that she go to her room. C.R. acquiesced.

As C.R. walked to her bedroom, Wallace followed. Once there, C.R. sat on a wooden chest in front of her bed. Wallace shut and locked the bedroom door. He stood in front of C.R. and asked, "how are we going to handle this?" Confused, C.R. offered to pay for whatever had been stolen. Wallace rejected her suggestion, stated that he knew she had no money, and repeated his question.

C.R. realized that Wallace's penis was erect and that he wanted to have sex.[4] After refusing C.R.'s request to shower, Wallace ordered her to undress and sit on the bed. Wallace then put his penis in C.R.'s mouth. According to C.R.'s testimony, "after he was done with that, he had asked if I had a condom and I had said yes and I grabbed the only condom I had." Wallace had C.R. position herself "on all fours" on the bed. Wallace placed the condom on his penis and then inserted his penis into C.R.'s vagina. After several minutes, Wallace attempted to change positions. While moving, C.R. pulled the condom off Wallace's penis and threw it in the trash. The assault, which lasted between 10 and 15 minutes, ceased because C.R. did not have another condom. During the assault Wallace was always between C.R. and the door.

Once clothed, Wallace showed C.R. several pictures of himself in front of books "like it's some court's library," and stated that he was "like a detective." When the pair finally left C.R.'s bedroom, Wallace told C.R. "that we owed him homage." She believed that meant Wallace would "keep coming back." Wallace then left C.R.'s residence.

At 2:00 a.m. on February 14, 2022, Norfolk Police Officer Logan Gardner arrived at C.R.'s house to discuss her stolen vehicle. C.R. spoke with Officer Gardner for 15 to 20 minutes but never mentioned the assault and did not appear emotional.

The next day, C.R. reported the assault to Detective Ryan Davis. C.R. told Detective Davis that she thought her assailant was a police officer. C.R. noted that Wallace wore a badge that was shaped like a shield with "gold ribbing" and "gold writing" but C.R. could not recall what the writing said. Detective Davis showed C.R. his detective badge, his police badge, his sergeant's badge, and a Norfolk sheriff's deputy badge. She ruled out each as the badge that

---

[4] C.R. testified that "that's when I realized he was -- while he was standing in front of me, his [penis] was directly in front of my face erect and that's when I realized what was going on."

- 4 -

Wallace wore. Based on his conversation with C.R., Detective Davis determined that a sexual assault investigation was needed.

After speaking with Detective Davis, C.R. went to Sentara Hospital and underwent a forensic examination with sexual assault nurse examiner Julianne Costello.[5] Costello noted that C.R. was calm and cooperative but very tearful during the two-and-a-half-hour examination. C.R. reported that she had new bruises, pelvic pain, redness and swelling in her vagina, and noticed a change in her vaginal discharge since the assault. C.R. stated that she did not have any of these symptoms before the assault.

At Wallace's trial, Costello explained that redness can occur from irritation when there is a lack of vaginal fluid and forced penetration. Costello acknowledged, however, that she could not date the bruising and that the redness found does not only happen in cases of rape and could be caused by self-stimulation. Based on Costello's training and experience, Costello believed C.R.'s injuries were consistent with an assault.

When Wallace was arrested, officers searched his vehicle and discovered a gun and his security uniform which consisted of a hat and vest. Wallace's vest was black, had metal plates in it, and the words "Armed Enforcement" on it. Detective Davis noted that Norfolk police wear similar vests. Additionally, the badge on Wallace's uniform was similar in shape and color to the Norfolk police badge.

At trial, C.R. confirmed that during the assault she did not protest but complied with Wallace's instructions because she thought he was a police officer. C.R. explained that she was raised to respect officers, and she was concerned that if she did not comply, Wallace would cause her to lose custody of her child. C.R. stated that she did not immediately report the assault to

---

[5] The trial court qualified Costello as an expert in sexual assault nurse examinations. Costello compiled a report at the conclusion of her examination of C.R. which was admitted into evidence.

Officer Gardner because she was still in shock. After disclosing the assault to her mother, C.R. reported the incident to police.

On cross-examination, C.R. noted that when Wallace initially called her, he made it seem as though there was something unruly going on in her home and that he needed to talk to her in person. When Wallace arrived and the pair spoke at the front door, C.R. did not feel endangered. It was only when she was alone in her locked bedroom with Wallace standing over her with his erect penis, asking how she was going to handle the situation, that C.R. felt that she was in danger.

Testifying in his own defense, Wallace denied threatening C.R. or telling her that he was a police officer. Wallace stated that he was a Harris Teeter security guard, that he was working when C.R.'s car was stolen, and that he called the police.

While Wallace was on his lunch break, C.R. came over to his truck and began to talk to him. At first, they discussed her car but then she complimented him on how he looked in his uniform and she told him that she could see his crotch. They also began to talk about her car and what was likely to happen to it.[6] Wallace noted that there was "a little vibe there" and that he and C.R. appeared to be "making a connection." Toward the end of the conversation, C.R. gave Wallace her address and invited him "over for a drink and [to] chill." After work, Wallace called C.R. to let her know that he was on his way.

When Wallace arrived, he called C.R. again to let her know he was outside. Wallace testified that he had no intention of going inside and instead wished to stay in his truck and talk with C.R. C.R., however, came to his truck and insisted he come inside. When Wallace entered C.R.'s home, he was unaware if anyone else was there and was unconcerned with any potential

---

[6] Wallace repeatedly testified that they talked "about everything[;]" the only specific topics he said they discussed are included herein.

shoplifting that may have occurred at Harris Teeter earlier that evening. After they engaged in intercourse, Wallace told C.R. that her friends had been caught stealing, the car's theft seemed like a set up, and that she should watch who she hangs around. On cross-examination, Wallace admitted he had a girlfriend at the time and that he deleted a call C.R. made to him.

At the conclusion of all the evidence, the trial court found that C.R.'s testimony was credible. The court found that Wallace was "engaging in an elaborate ruse to get the victim's phone number" and her good favor. It held that Wallace was wearing attire that could have been confusing regarding whether he was a police officer. When Wallace arrived at C.R.'s home, he told her that he was an on-duty police officer. Wallace then instructed C.R. to go to the bedroom and, once there, lock the door. While C.R. sat on a chest in front of her bed, Wallace positioned himself in front of her and asked how she would resolve the shoplifting issue. The trial court credited C.R.'s explanation that she was mainly concerned with "the custody situation" but also noted that she was scared Wallace could hurt her. It found that C.R. sustained injuries because of the assault. The trial court denied Wallace's renewed motion to strike and found that the evidence proved that Wallace impersonated a police office and sodomized and raped C.R.

Before sentencing, the trial court issued a letter opinion detailing its reasons for denying Wallace's renewed motion to strike. The trial court found that C.R. submitted to Wallace "because she was primarily concerned about Wallace taking subsequent actions that could result in her losing custody of her child," but also because "she was in fear of bodily injury to some degree." When C.R. "was in her bedroom with Wallace and realized that Wallace was about to sexually assault her, . . . she felt that she was in danger" and feared greater physical harm if she resisted him.

The trial court held that even without C.R.'s fear of bodily harm, Wallace's intimidation alone could support the sexual assault convictions. It noted that "Wallace's actions were

- 7 -

conducted while C.R. credibly understood that [Wallace] was a police officer conducting an official investigation" and that this circumstance "creat[ed] a power imbalance that pressured C.R. to submit to [the] sexual assault[s]." "Wallace's impersonation of a police officer combined with his interactions with C.R. sufficiently intimidated [her] to submit to Wallace's express and implied demands even if [she] were not placed in fear of bodily harm." The trial court sentenced Wallace to 45 years, 12 months' incarceration with 26 years suspended. Wallace appeals.

## ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

## I. Impersonating a Police Officer

"Any person who falsely assumes or exercises the functions, powers, duties, and privileges incident to the office of sheriff, police officer, marshal, or other peace officer, . . . or who falsely assumes or pretends to be any such officer, is guilty[.]" Code § 18.2-174. A person falsely assumes to be in law enforcement if through his actions, attire, inquires, or statements he could lead a reasonable person to believe he is a law enforcement officer. *See generally English v. Commonwealth*, 43 Va. App. 370, 372 (2004). Wallace contends that the trial court erred when it found the evidence sufficient to prove that he impersonated a law enforcement officer.

In *English v. Commonwealth*, this Court held that English's actions during a vehicle stop "exceeded the scope of his authority" as a fugitive recovery agent and that his attire, statements, and inquires suggested that he was part of law enforcement. *Id.* at 373. English "wore a misleading badge representing that he was part of a 'special investigations unit'" of law enforcement. *Id.* English told the driver that "he was with a 'violent crimes unit,' further suggesting he was part of a law enforcement body." *Id.* Although neither of the vehicle's occupants matched the description of the fugitive he was looking for, English detained the driver and interrogated her about whether she had been drinking and encouraged her to tell the truth so he could help her. *Id.* at 373-74. We held that "[t]hese actions were unrelated to his duties as a fugitive recovery agent and suggested that he was a law enforcement officer" and that the evidence was sufficient to prove that English falsely assumed or pretended to be a law enforcement officer. *Id.* at 374.

Here, Wallace wore a badge that resembled a police badge and a paramilitary outfit with "Armed Enforcement" embroidered on both his vest and hat. As in *English*, Wallace introduced himself in a way that suggested he was a law enforcement officer. In fact, Wallace initially told C.R. that he was an off-duty police officer working overtime at Harris Teeter. After C.R. had

- 9 -

left Harris Teeter, Wallace called her and stated that he needed to speak with her in person about her roommate. When he arrived at C.R.'s home, Wallace stated he was now "on-duty" and investigating C.R.'s roommates for shoplifting. Wallace's attire, statements, and actions suggested to C.R. that he was in law enforcement. Considering all of the evidence, a reasonable fact finder could conclude beyond a reasonable doubt that Wallace falsely assumed or pretended to be a law enforcement officer.

## II. Sex Crimes

"If any person has sexual intercourse with a complaining witness . . . and such act is accomplished . . . against the complaining witness's will, by force, threat or intimidation . . . he or she shall be guilty of rape." Code § 18.2-61(A)(i). Further, "[a]n accused shall be guilty of forcible sodomy if he . . . engages in . . . fellatio . . . with a complaining witness" and "[t]he act is accomplished against the will of the complaining witness, by force, threat or intimidation." Code § 18.2-67.1(A)(2). "The issue of whether the crime was committed by 'force, threat or intimidation' is a question of fact." *Bondi v. Commonwealth*, 70 Va. App. 79, 88 (2019) (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002)).

Wallace contends that in the trial court's letter opinion it "incorrectly interpreted cases from [t]his Court defining the scope of what qualifies as 'intimidation' under the [r]ape and [f]orcible [s]odomy statu[t]es and used that inaccurate analysis to find sufficient intimidation in convicting" him of both forcible sodomy and rape.

The term "intimidation" means "putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will." *Bondi*, 70 Va. App. at 90 (quoting *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985)). Intimidation "may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Id.*; *see also Wactor*, 38 Va. App. at 383-84 (victim was in vulnerable

position as a patient in hospital under the care of the assailant-nurse). "A factfinder may consider 'the victim's age, the relative size of the defendant and victim, the familial relationship between the defendant and victim, and the vulnerable position of the victim' in evaluating whether an act was accomplished by intimidation." *Bondi*, 70 Va. App. at 90 (quoting *Commonwealth v. Bower*, 264 Va. 41, 46 (2002)). "The 'fear of bodily harm' need not be separate and apart from the fear of the possibility of bodily injury inherent in the sexual assault itself." *Id.* (quoting *Bower*, 264 Va. at 45-46).

In *Mohajer v. Commonwealth*, 40 Va. App. 312, 323 (2003) (en banc), this Court held that the victim, who was alone on a massage table and naked except for a towel, was "vulnerable and susceptible to the psychological pressure and control exercised by Mohajer." "Mohajer [had] falsely represented to [the victim] that he was a police officer and showed her what he asserted was a police badge, thereby making [the victim] feel 'comfortable.'" *Id.* at 322. When Mohajer began to massage the victim's breasts, the victim became "confused and did not know 'how she was supposed to react or what [she] was supposed to do.' [The victim] was naked and alone in the presence of someone she believed she could trust—a masseur and police officer." *Id.* at 322-23. We held that the victim's testimony that she was "scared to death," because she "had no idea what was going to happen next," was sufficient to prove that the victim "feared the harm inherent in Mohajer's assault, viz. bodily harm." *Id.* at 323.

Wallace entered C.R.'s home upon the false pretense that he was a police officer investigating her roommates for shoplifting. Initially, C.R. was not afraid of Wallace because she believed he was someone she could trust—a police officer. C.R. only became afraid when Wallace followed her to her bedroom, locked the door behind him, stood over her with his erect penis, and asked her how she would resolve the shoplifting issue. After refusing C.R.'s request to leave the room, Wallace placed his penis into her mouth. After several minutes, Wallace moved C.R. to the

- 11 -

bed, requested a condom, placed the condom on his penis, and inserted his penis in her vagina. The assault only stopped when, as Wallace was changing to a new sexual position, C.R. removed the condom from Wallace's penis, threw it in the trash, and proclaimed that she did not have another condom. These circumstances left C.R. vulnerable and susceptible to the psychological pressure and control Wallace exercised.

C.R. testified that she acquiesced to fellatio and vaginal intercourse because she feared legal repercussions and bodily injury if she did not do as Wallace demanded. After the attack, C.R. stated that she was in shock and was unable to report the incident to Officer Gardner when he came to her home hours later to discuss her stolen car. We find that the trial court did not incorrectly interpret this Court's precedents concerning intimidation, and further, that credible evidence supports the trial court's finding that Wallace raped and sodomized C.R.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

<em>Affirmed.</em>