COURT OF APPEALS OF VIRGINIA

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia


THOMAS MANTEZ, III

                                             MEMORANDUM OPINION[*] BY
v.   Record No. 2237-23-2         JUDGE JEAN HARRISON CLEMENTS
                                                SEPTEMBER 30, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LUNENBURG COUNTY
J. William Watson, Jr., Judge

Samantha Offutt Thames, Senior Appellate Attorney (Virginia
Indigent Defense Commission, on briefs), for appellant.

Brooke I. Hettig, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Thomas Mantez, III, of second-degree murder, use of a firearm in the

commission of murder, and stabbing in the commission of a felony related to the death of his

fiancée, Marjureka White-Jennings.  On appeal, Mantez challenges the sufficiency of the

evidence to prove that he was the perpetrator.  He argues that no evidence connected him to the

crimes or excluded his hypothesis that White-Jenning's prior boyfriend, Dejuan Elder, was the

actual perpetrator.  He also contends that the trial court erred by denying his motion to exclude

expert testimony detailing his cell phone's location before, during, and after the murder.  Finding

no error, we affirm.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

Consistent "with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Edelstein v. Commonwealth*, 83 Va. App. 345, 349 (2025) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Commonwealth v. Cady*, 300 Va. 325, 329 (2021).

In 2019, White-Jennings and Elder had a son, Z.E. White-Jennings had custody of Z.E., and Elder did not pay any child support despite a court order requiring him to do so. Instead, Elder's parents paid the support obligation. In late 2019, White-Jennings filed a petition to increase Elder's child support obligation, and a court hearing was scheduled for January 2, 2020. White-Jennings's petition upset Elder "a little . . . but not really" because Elder did not intend to pay whatever the obligation was.

White-Jennings had lived with a friend, Angela Harris. Harris owned two firearms, one of which was "a 9mm." Harris and White-Jennings agreed that White-Jennings would keep the 9mm in her bedroom, which was connected to the primary bathroom; Harris kept the other firearm in her bedroom. White-Jennings started dating Mantez in 2019, and he often stayed at Harris's house. At Harris's request, White-Jennings and Mantez moved out before Christmas in 2019. White-Jennings did not have permission to take the 9mm firearm and did not ask Harris if she could do so.

On December 30, 2019, White-Jennings wanted to "go out" with her friends, Jessica Hurt and Destiny Crawley. Mantez did not want her to leave their residence and "assault[ed]" her. Although White-Jennings initially told her friends that she could not "go out" because she had a flat tire, she later confided that Mantez had hit her, causing her jaw to feel "like it was broken" and her lips to swell.

Around noon the next day, New Year's Eve, Mantez sent a text message to a contact named "Mad Dog," asking if he "had a blicka [Mantez] could use." "Blicka" is a slang term for "gun." Mantez then returned to Harris's house even though he had not been invited, claiming that he needed to retrieve shampoo that White-Jennings had left. Later that day, Harris searched her home for her 9mm firearm but could not find it.

Cell phone records showed that from 3:40 to 4:02 p.m., Mantez's cell phone connected to a series of cell phone towers demonstrating that it traveled from the area of his residence toward South Hill, where it used towers until 5:30 p.m. Between 5:30 and 6:00 p.m., his phone traveled back towards his residence. Then from 6:00 p.m. through 8:00 p.m., his phone used towers that "bracketed" his residence, indicating that the phone was at or near his residence.

Meanwhile, on the afternoon of New Year's Eve, White-Jennings unexpectedly brought Z.E. to Elder's house, where he lived with his parents. She was behaving strangely, and her face was "swollen." Later, White-Jennings drove Elder and Z.E. to a New Year's Eve party at Elder's aunt's residence. At the party, Elder's mother, Aretha, noticed that White-Jennings was unusually quiet and the "right side of her face was swollen." When Aretha asked White-Jennings what was "wrong" with her face, White-Jennings tearfully told her that Mantez had been "putting his hands on her" and "beating her."

Elder decided to take White-Jennings back to his house so they could talk in private. Cell phone records indicated that she was at or near Elder's residence between 6:00 and 6:40 p.m.[1] White-Jennings, who was still "sad and crying," told Elder that she had wanted to "go out" the "night before," but Mantez would not let her go and "just started beating . . . her." Elder and White-Jennings then engaged in consensual sexual intercourse, during which she "grabb[ed]" his

---

[1] "The only time" Elder's phone connected to a cell phone tower that day was when he tried to call White-Jennings's phone at 10:27 p.m. that evening; the call did not connect. His phone used a tower near his house that was not near the crime scene.

back. White-Jennings "wash[ed] up" before she left, but did not shower. Mantez called White-Jennings repeatedly while she was with Elder. Her cell phone records confirmed that Mantez called her 12 times during that period and also sent text messages stating, "Answer the phone," "Just gotta ask a question," and "Cool." He also sent other messages that stated, "if you don't answer ima get on bullshit frfr," and "All of these" with a nude photograph of White-Jennings, but those messages were later deleted from his phone.

After they had sex, White-Jennings drove Elder to Elaine Eppes's house for another New Year's Eve party. They discussed whether White-Jennings should stay for the party, but she decided to "have a couple drinks" at Hurt and Crawley's house instead, like she had wanted to do the previous night. White-Jennings called Hurt, and they agreed to have "a little New Year's Eve party" at Hurt's house with "some friends." White-Jennings told Hurt that Mantez was "talking to somebody else," and she planned "to break up" with him.

White-Jennings drove to Hurt's house for the party. Hurt was not there, however, so White-Jennings spoke to Hurt's sister and left, intending to drive home for "clean clothes" and then return. Cell phone records showed that from 6:40 p.m. to 7:20 p.m., White-Jennings's cell phone used a series of cell phone towers between Elder's residence and her own. As White-Jennings drove home alone, she made a 13-minute phone call to Mantez, whose cell phone records demonstrated that he was also at their residence. Notwithstanding those records, Mantez sent White-Jennings a text message at 7:00 p.m. that stated, "I'm otw," though that text was later deleted from his phone. White-Jennings also called Crawley twice while driving; their second call "dropped" as she arrived at her residence between 7:19 and 7:22 p.m. White-Jennings had asked Crawley to stay on the line with her and had placed her phone on mute before the call dropped. After 7:20 p.m. White-Jennings's phone only used two cell phone towers that bracketed her

residence. Between 7:38 p.m. and 10:07 p.m., her phone received nearly 25 incoming calls that she did not answer, including many calls from Hurt and Crawley.

Sometime before 8:00 p.m., while his phone was still at his residence, Mantez called Vicky Carnes, whom he had lived with earlier in 2019, and said, "well, I really did it." Believing that Mantez and White-Jennings had "broken up," Carnes told Mantez that he could stay with her for a few days. Mantez later asked Carnes in a text message to "leave the door open."

From 8:00 p.m. until 8:33 p.m., Mantez's phone used cell towers indicating that it was traveling from the area of his residence back to South Hill. The phone then stayed in South Hill until 9:19 p.m., during which time Mantez sent White-Jennings a text that said, "I'm on the way now my fault." From 9:19 p.m. until 9:48 p.m., Mantez's phone used cell towers indicating that it was traveling back towards his residence from South Hill. He arrived back at his residence just before 10:00 p.m. At 9:56 p.m., he called White-Jennings's stepfather, Jacoby Freeman, Sr., and said that he had found White-Jennings at their residence "in a pool of blood." Mantez then called 911 minutes later.

At the same time, White-Jennings's mother, Joyce, called White-Jennings's neighbor and landlord, Valderie Gee-Parker. Joyce asked Gee-Parker "to go across the road" and wait with White-Jennings until the ambulance arrived. Gee-Parker crossed the street and noticed that the front door was open. She ascended the porch, looked through the door, and saw Mantez stooped over White-Jennings's body. Mantez was saying, "come on . . . get up." Gee-Parker walked inside and saw that White-Jennings's head was in a thick "pool of blood."

Meanwhile, after White-Jennings had dropped Elder off at Eppes's house around 5:00 p.m., he entered the party, greeted Eppes, and started drinking alcohol. Eppes testified that Elder behaved normally. In addition, both Eppes and Elder testified that other than a ten-minute excursion to buy "more beer" with another partygoer, Elder remained at the party that night. While at the party,

however, Elder learned that something had happened to White-Jennings.  He called White-Jennings, but it "went to voicemail."  Elder then called Joyce, who was crying because White-Jennings was dead.

Partygoers, including Eppes and her daughter, saw Elder "crying" when he "received the news."  One witness testified that Elder "screamed," "ran into the road," and "started punching the road" in grief.  Another testified that he "screamed and yelled" and "hit the ground with his fists."  Eventually, Elder returned to his aunt's house, hugged Z.E., and "fell on his side crying."  Thirty minutes later, Elder and Aretha returned to Eppes's house; Elder was still inconsolable, and Aretha saw him again "pounding . . . the pavement with his fists."

Officer Tonya Jones drove to White-Jennings's residence in response to the 911 call.  Jones walked onto the porch, looked through the open front door, and saw White-Jennings's body on the floor just "a few feet" inside.  The house "had been tore up, almost like an altercation or something" had happened, and "furniture was pushed away from the wall."  White-Jennings plainly had been deceased for a significant period of time, as she was not moving and the blood around her "had congealed."  Within minutes a paramedic arrived and confirmed that White-Jennings was dead.

Officer Jones testified that Mantez was "very defensive" at the scene.  He stated that he had entered the residence, found White-Jennings, and touched her.  Jones noticed that neither his white shoes nor hands were bloody, but the paramedic who attended to White-Jennings got blood on his boots because "there was no way to get to [White-Jennings] without getting into the blood a little bit."  Mantez told another officer, Deputy Josh Traylor, that he had been in South Hill, showing him "text messages" from his phone to "prove" his location.  Deputy Traylor believed that Mantez had "changed his shoes" and was "acting crying," like he was not "sincere."  As the officers began investigating the scene, Mantez approached them and disregarded their instructions to "back away."

- 6 -

Eventually, officers detained Mantez, placed him in the back seat of a police car, and transported him to the Sheriff's Department for questioning. Mantez stated that he had been in South Hill, which was about a 40-minute drive south from his residence, visiting family "most of" that day, and that he had seen White-Jennings earlier that morning and once around 3:00 p.m. at a nearby park. He claimed that he last spoke to White-Jennings over the phone for four minutes around 6:00 or 7:00 p.m. and planned to meet her back at their house, but he was in South Hill "until around 9:15 p.m." Police asked Mantez who he thought could have murdered White-Jennings; Mantez replied that White-Jennings "was sneaky" and "her whole family was whores." Police obtained a buccal swab from Mantez's cheek and gunshot residue samples from his hands, though his hands were not "bagged" before the samples were taken. Police also seized the clothing Mantez was wearing, including his white tennis shoes.

Based on Mantez's statements, Lieutenant Kevin Abernathy and Investigator Wallace drove to South Hill and spoke to some of Mantez's family. His brother, Christopher, lived in South Hill and stated that Mantez had been with him on New Year's Eve "until about 6:00 or 7:00 in the evening and then came back around 8:00 o'clock." Mantez had a firearm with him. Christopher and Mantez "s[a]t in the car" together and drove to a nearby convenience store. Later, the officers visited the convenience store and retrieved surveillance video recording Mantez and his brother. In the video, Mantez arrived in a gold Buick and repeatedly examined his black shoes as he exited the car. Police never found any black shoes matching the size and style of those Mantez wore in the surveillance video.

Virginia State Police Trooper Brandon May photographed and "processed" the crime scene, while Trooper D.E. Psihas examined two vehicles in White-Jennings's driveway: a Chevrolet Trailblazer and a gold Buick. Inside the house, blood droplets surrounded the fireplace, which was about four feet from White-Jennings's body, indicative of "a more violent reason for the injury or

death."  In addition, red "footwear impression were visible" both inside and outside the residence, and red stains were on the rear, driver-side door handle and back seat of the gold Buick.  The Trailblazer also had a red stain on the driver's door handle.  Trooper Psihas took samples of each of the stains from the vehicles and testified that the Buick was "very cluttered" and "filled with clothing."

Trooper May concluded that somebody wearing shoes "with a particular pattern" "had stepped into . . . a red stain and both walked out [of] and in[to]" the residence and "up and down the [porch] stairway."  The footprints were more defined as they left the house and fainter as they reentered.  The footprints also extended from White-Jennings's body, around a kitchen island, and to the kitchen sink.  Trooper Psihas found four pairs of shoes in the Buick, two of which had a circular pattern on the bottom similar to the footprints around the crime scene.  But subsequent forensic analysis revealed that none of the shoes matched the bloody footprints at the scene.

Police also found a bloody wig and black leather jacket, which was "turned inside out," on the floor near White-Jennings's body.  The jacket had a bullet hole in it.  There was also a bullet hole in the kitchen island "directly behind" White-Jennings's body.  Police recovered the bullet after tracking its downward path through the island and into the floor.  Subsequent forensic analysis determined that the bullet's caliber was 9mm.

Doctor Jennifer Bowers performed the autopsy of White-Jennings's body.  White-Jennings had sustained 12 "sharp force injuries," or stab wounds, to her chin, face, and neck.  One of the wounds was more than five inches deep; others penetrated her left jugular vein, left carotid artery, thyroid, esophagus, and other structures in her neck and mouth.  White-Jennings also suffered two sharp force injuries to her chest and two gunshot wounds to her head and right shoulder.  One bullet entered the back of her head "through the occipital bone"; Bowers recovered the "deformed jacketed bullet and [a] fragment" from inside White-Jennings's skull.  The other bullet entered the

back of her right shoulder and exited her body. Bowers concluded that White-Jennings died from the sharp force injuries and the gunshot wound to the head, though she could not determine the order of the injuries. Dr. Bowers also took samples of White-Jennings's fingernails for forensic analysis; her fingernails did not have any "fresh chips [or] tears," which could have reflected "a scuffle."

Memory Dalton, a forensic scientist with the Virginia Department of Forensic Science, analyzed much of the evidence police found at the crime scene for "DNA or biological material." White-Jennings's blood was on Mantez's shorts, a sock taken from his Buick, and all three of the samples taken from the blood spots on the two vehicles. Male DNA that was not Mantez's was under White-Jennings's fingernails. In addition, Mary Keehan, another forensic scientist, analyzed the gunshot residue samples taken from Mantez's hands and determined that both samples contained particles "consistent with primer residue." Her report explained that primer reside could be deposited by "firing a weapon, handling a weapon, being in the proximity to the discharge of a weapon or coming into contact with an object that has primer residue on it."

Two days after the homicide, Elder appeared in court for the hearing on White-Jennings's pending petition to increase his child support obligation for Z.E. The judge dismissed the petition given White-Jennings's death. After the hearing, Elder spoke to an investigator about the homicide and told her that he never intended to pay White-Jennings child support even if the court had ordered an increased amount. Elder's hands were swollen as he spoke to the investigator; when asked, he explained that he had "punch[ed] the road" after learning that White-Jennings had died. Elder did not tell the investigator that he had sex with White-Jennings on the day of her death, later testifying that it was "none of her business." But after officers found unknown DNA on White-Jennings's person and reapproached Elder, he provided a buccal sample. Forensic analysis determined that Elder's DNA was under White-Jennings's fingernails.

Mantez was charged with first-degree murder, maliciously stabbing while in the commission of a felony, and use of a firearm in the commission of a felony. Mantez was incarcerated before trial with Michael Holmes, who had been a confidential informant for the drug taskforce. Mantez told Holmes that he had "an argument" with his "girlfriend." They "got into a fight," and Mantez "picked up . . . some scissors or a knife and cut her or something, an accident." After stabbing his girlfriend, Mantez stated that he "left" the house to "cool down" and then "came back." Mantez claimed that his girlfriend had tried to "put[] him out" and make him "leave," but he "didn't want to go." Holmes considered Mantez a "friend" and did not report his statements to police. After his release, however, Holmes mentioned Mantez's statements to another individual during a recorded, controlled buy. Officers heard the statement and approached him. Holmes, who had been convicted of multiple felonies, did not want to testify against Mantez.

The trial court qualified Jeremy D'Errico, an investigator for the Federal Bureau of Investigation, as an expert in cell phone records and data analysis without objection. D'Errico had analyzed the cell phone data and records from White-Jennings, Mantez, and Elder's cell phones to determine their "approximate locations" around the time of the murder. D'Errico also extracted text messages and other information from White-Jennings and Mantez's phones to supplement the historical cell site analysis. The cell phone company provided D'Errico "call detail records and time on tower records," which document "when calls are made or received, when text messages are made or received, and when data sessions are occurring on the phone." Using that information, D'Errico approximated the phones' locations by determining which cell phone towers they used. He explained that phones generally connect to the "clearest and strongest signal," which is not always from the closest cell tower, as geography can interfere with a tower's signal.

D'Errico testified that each cell phone tower generally provides service through three, triangular sectors around its circumference. Certain tower antennas will interact with a cell

phone depending on which of the sectors the phone is in, though the sectors slightly overlap to ensure continual service. Generally, D'Errico could not determine from the records how far away a phone was from a tower, only in which sector the "radio frequencies [were] traveling" from that tower.

Ben Levitan, whom the trial court also qualified as an expert in cell phone networks and data, testified for Mantez. Levitan testified that cell towers do not provide service through triangular sectors around the tower; using basic radio technology, they provide service to all cell phones within three to five miles of the tower. Thus, Levitan testified that the cell phone data and records could not reveal what side of a cell tower a phone was on, only that the phone was within the circular "coverage area" of that tower. He added that it was "misconception" that cell phones always look "for the strongest tower or the strongest signal." He stated that a cell phone will always connect to the cell tower whose diameter it is within, so every cell phone is always connected to the tower in closest proximity. Based on his review of the records, Levitan opined that Mantez was "on his phone nonstop" between 7:00 and 8:00 p.m. using an amount of data indicating that he was streaming a movie or was looking at "pictures, graphics, video stuff."

After the close of the evidence and argument by counsel, the jury convicted Mantez of second-degree murder, use of a firearm in the commission of murder, and stabbing in the commission of a felony. Mantez moved to set aside the jury's verdicts. He argued generally that the evidence failed to prove beyond a reasonable doubt that he, and not Elder, was the perpetrator. He contended that only Elder's DNA was found on White-Jennings's person and that Elder had a motive because White-Jennings recently had filed a petition to increase his child support obligation. The trial court denied the motion, finding that the matter was properly submitted to the jury. The trial court sentenced Mantez to 48 years' incarceration with 15 years suspended, with 3 years' supervised probation following his release.

ANALYSIS

I. Sufficiency of the Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Mantez argues that the evidence was insufficient to demonstrate that he killed White-Jennings because it failed to exclude the reasonable hypothesis that Elder was the perpetrator. He contends that Elder had "clear means and motive" and that it was not reasonable that Elder and White-Jennings reconnected and had a sexual encounter just days before a hearing on the petition to increase his child support obligation. Pressing his claim, Mantez asserts that the evidence demonstrated nothing more than his "digital proximity" to the crime, and mere

- 12 -

presence at the scene of a crime is insufficient to sustain a conviction. He maintains that the cell phone location data was not exact but approximate. In addition, he emphasizes Levitan's testimony that his phone was in "constant" use during the time the Commonwealth alleged the murder occurred, demonstrating that he was using his phone to stream entertainment and not "murdering" White-Jennings.

Those circumstances, in his view, "actively disprove[d]" Holmes's testimony that Mantez "confess[ed]" to harming White-Jennings. Further, Mantez argues that no physical evidence connected him to the murder, and none of the text messages he sent White-Jennings demonstrated that he was still angry with her or that their fight from the previous day had extended into New Year's Eve. He posits that the blood found on his clothes could have been deposited after he found her body and squatted next to her, and the gunshot residue could have been on his hands from when he was transported in the back of the police car with his hands unbagged.

The "Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). The reasonable hypothesis of innocence principle does not add to the Commonwealth's burden; it is "simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth*

- 13 -

*v. Moseley*, 293 Va. 455, 463 (2017)). When "circumstantial evidence is sufficient to exclude every [proffered] reasonable hypothesis of innocence, it is sufficient to support a conviction." *Id.* (alteration in original) (quoting *Cook v. Commonwealth*, 226 Va. 427, 433 (1983)).

"Circumstantial evidence is not viewed in isolation." *Hooper v. Commonwealth*, 78 Va. App. 508, 516 (2023) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Id.* Thus, on appeal, we do not ask "whether there was 'some evidence' to support a defendant's hypothesis of innocence, because the totality of the circumstantial evidence may allow a factfinder to reject an asserted hypothesis of innocence as unreasonable." *Wilkerson*, ___ Va. at ___ (citing *Moseley*, 293 Va. at 464-65). A guilty verdict means that the jury "has found by a process of elimination that the evidence does not contain a reasonable theory of innocence." *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." *Id.*

Here, the evidence overwhelmingly identifies Mantez and excludes Elder as the perpetrator. The day before the murder, Mantez physically assaulted White-Jennings because she wanted to "go out" with friends. Soon after the assault, he sent a text message explicitly asking a contact for a gun to "use." On the day of the murder, Mantez went to Harris's house without permission, where he knew there was a 9mm firearm. Later, Harris searched for and could not find her firearm, Mantez had a firearm while vising his brother, and White-Jennings was shot with a 9mm firearm. In addition, forensic analysis revealed that gunshot residue was on his hands shortly after the murder.

In addition, the cell phone location data placed both White-Jennings and Mantez's cell phones near their shared residence—where she was murdered—between 7:20 p.m. and 8:00 p.m. on the day of the murder. White-Jennings went home intending to end her relationship with Mantez, change clothes, and return to the party with Hurt and Crawley. Shortly before 8:00 p.m., Mantez cryptically told Carnes, "well, I really did it." His phone then traveled back to South Hill, where surveillance video recorded him wearing—and closely examining—black shoes. This timeline contradicted Mantez's statements to police that he had seen White-Jennings only twice that day, once in the morning and once at a park around 3:00 p.m. Given the discrepancy, the fact-finder reasonably could "disbelieve" Mantez's "self-serving" statements and "conclude that he was lying to conceal his guilt." *Newsome v. Commonwealth*, 81 Va. App. 43, 55 (2024) (quoting *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022)).

In addition, it is "universally conceded that . . . an accused's flight . . . concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991)). Here, Mantez was not wearing the black shoes he had been closely examining after he returned to his residence and called the police. Instead, he was wearing white shoes that did not have blood on them. Police never found the black shoes; nor did they find any shoes that matched the bloody footprints both inside and outside the residence even though the paramedic said one could not approach the body without stepping in blood. From those circumstances, the jury reasonably could infer that Mantez left the bloody footprints with the black shoes and then, realizing that those shoes connected him to the crime scene, disposed of them before police arrived. Moreover, his cell phone records revealed many incriminating text messages sent to White-Jennings that had been

deleted before police seized his phone, from which the fact finder could reasonably infer additional consciousness of guilt.

Finally, a defendant's statements that "tend[] to show guilt" are, like any party admission, "'evidence of a most satisfactory nature and may furnish the strongest and most convincing evidence of truth.'" *Prince v. Commonwealth*, 228 Va. 610, 613 (1985) (quoting *Tyree v. Lariew*, 208 Va. 382, 385 (1967)). While incarcerated, Mantez admitted to Holmes that he had attacked White-Jennings with "scissors or a knife" after they "got into a fight" because White-Jennings had tried to make him "leave," which corroborated the nature of the injuries and Hurt's testimony that White-Jennings intended to break up with Mantez. Moreover, Mantez admitted to Holmes that after the attack, he left the residence to "cool down" and then "came back," which corroborated the cell phone location data that depicted Mantez traveling from his residence to South Hill and back between 8:00 p.m. and 10:00 p.m. Later, Mantez showed insincere remorse in front of the police and called his recently deceased fiancée and her family "whores." *See Wagoner v. Commonwealth*, 63 Va. App. 229, 251 (2014) ("A jury may reject a witness' testimony in part and accept it in part." (quoting *Hopkins v. Commonwealth*, 230 Va. 280, 293 (1985)).

By contrast, the jury had sufficient evidence to exclude Elder as the perpetrator. White-Jennings dropped him off at New Year's Eve party at Eppes's house before the murder. Eppes saw him enter the party alone, where he remained for the rest of the night save a ten-minute excursion with another partygoer to obtain more beer. Multiple witnesses were present when Elder learned that White-Jennings had died and described his sincere and inconsolable reaction. He "screamed," "ran into the road," and "started punching the road" in grief. When he returned to his aunt's house, he hugged his recently motherless son and "fell on his side crying."

Although Elder's DNA was found under White-Jennings fingernails, her nails were not damaged or torn, so the jury reasonably could have found that his DNA was transferred to White-Jennings during their tryst earlier in the day. Mantez encourages this Court to reject that theory as inherently incredible, but the jury could have reasonably believed that White-Jennings and Elder reconnected and had sex after Mantez had assaulted her the previous night, and witnesses saw White-Jennings and Elder peacefully together at a party the day of the murder. *See Grimaldo v. Commonwealth*, 82 Va. App. 304, 322 (2024) ("It is hardly contrary to the human experience for two romantically involved adults to vacillate between break-up and reconciliation." (citing *Richardson v. State*, 581 S.E.2d 528, 529 (Ga. 2003))). Indeed, it was at that party that witnesses noticed that White-Jennings's face was swollen, and she tearfully stated that Mantez had been "putting his hands on her" and "beating her." Thus, the presence of Elder's DNA on White-Jennings did not require the jury to credit the hypothesis that Elder was the actual perpetrator. On the other hand, Mantez's own statements, combined with the physical and circumstantial evidence, amply support the jury's conclusion that he was the perpetrator. Thus, the evidence was sufficient to sustain the jury's verdicts.

## II. Cell Phone Data and Location Evidence

The "admission or exclusion of expert testimony is a matter within the sound discretion of the [trial] court, and we will reverse the . . . judgment only when the court has abused this discretion." *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021) (citing *Keesee v. Donigan*, 259 Va. 157, 161 (2000)). Under that familiar standard of review, a trial court "has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Id.* at 93 (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). "Only when reasonable jurists could not differ can we say an

- 17 -

abuse of discretion has occurred." *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

Before trial, Mantez moved to exclude the Commonwealth's evidence on cell phone location data, including D'Errico's report and testimony and Google Map data. Mantez argued that D'Errico's conclusions did not "reflect the science or the state of technology" and were misleading because he did not understand "cell phone technology" which was "basic radio science." In support of his motion, he offered Levitan's expert testimony that cell phone towers provide service in "spheres," not through "pie shaped" sectors. The trial court denied the motion, finding that to grant it would require the court to make a credibility determination between the expert witnesses regarding how cell phone towers operated, which was "the province of the jury." The court concluded that Mantez's arguments addressed the weight of the Commonwealth's evidence, not its admissibility.

On appeal, Mantez argues that the trial court abused its discretion by denying his motion because D'Errico's testimony and report were not supported by an adequate factual foundation. He maintains that Levitan, "an acknowledged expert," demonstrated that D'Errico did not understand how cell towers operated, so his report and testimony were dependent on "information that [was] ultimately not true."

Expert testimony cannot be speculative or "founded upon assumptions that have no basis in fact." *Toraish v. Lee*, 293 Va. 262, 269 (2017) (quoting *Norfolk S. Ry. v. Rogers*, 270 Va. 468, 479 (2005)). But challenging an "expert's measurements, methods and determinations . . . does not render inadmissible expert opinion based on those measurements, methods and computations"; rather, such a challenge goes only to the "weight of the evidence" and is therefore a "factual question[] to be determined by the jury." *Lorenz v. Parker*, 82 Va. App. 413, 427 (2024) (quoting *Castillo v. Commonwealth*, 70 Va. App. 394, 439 (2019)). Mantez did not object to D'Errico's

qualification as an expert witness. As part of his expert opinion and testimony, D'Errico explained that cell phone towers provide service through triangular sectors around its circumference. Certain tower antennas interact with a phone depending on which of the sectors the phone is in, permitting conclusions about which side of a tower a phone is on. Levitan disagreed with D'Errico and provided a different opinion about how cell phone towers operate. The substance of their disagreement, however, did not involve an underlying factual premise, as Mantez argues. Instead, they disagreed on the technical aspects of their expert opinions.

The "purpose of expert testimony is to provide the trier of fact with the 'scientific, technical, or other specialized knowledge' necessary to 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Toraish*, 293 Va. at 272 (quoting Va. R. Evid. 2:702(a)(i)). The competing expert testimony regarding "technical" knowledge—how cell phone towers operate—was offered to persuade the jury of each side's position on a "fact in issue"; namely, Mantez's location around the time of the murder. *Id.* Levitan's disagreement with D'Errico about how cell phone towers operated did not render D'Errico's testimony inadmissible, just as D'Errico's contrary opinion did not render Levitan's testimony inadmissible. Rather, the contradictions addressed the weight of each expert's opinion, and the issue was appropriately submitted to and resolved by the jury. Thus, the trial court did not abuse its discretion by denying Mantez's motion.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*