COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, Ortiz and Chaney


DAVID LYDELL WITCHER

v.     Record No. 0961-24-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*]
PER CURIAM
JANUARY 27, 2026


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
M. Duncan Minton, Jr., Judge

(Bobbi R. Graves; Graves Law, P.C., on brief), for appellant.

(Jason S. Miyares,[1] Attorney General; Rebecca Johnson Hickey,
Assistant Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court of Chesterfield County convicted David Lydell

Witcher of possession of a firearm by a convicted felon, in violation of Code § 18.2-308.2;

possession of ammunition by a convicted felon, in violation of Code § 18.2-308.2; possession of

a firearm while distributing controlled substances, in violation of Code § 18.2-308.4(C); felon

with a concealed weapon, in violation of Code § 18.2-308.2; and two counts of possession of

schedule I/II controlled substances with the intent to distribute, second or subsequent offences, in

violation of Code § 18.2-248(C). The trial court sentenced Witcher to 40 years of incarceration,

with 24 years suspended. Witcher argues on appeal that the trial court abused its discretion by

sentencing him to 16 years of active incarceration, claiming that the trial court erred in not

considering his mitigation evidence. He also contends that the evidence was insufficient to

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

prove that he possessed a firearm, ammunition, and illegal substances with the intent to distribute.[2]

BACKGROUND[3]

Officers Jared Hanko and Collin Webb of the Chesterfield County Police Department were patrolling a known high-crime, high-drug area near the Martha-Kay Motel in Chesterfield County.[4] When Officer Hanko ran the license plate of a car exiting the parking lot, the record showed that it was registered to Witcher and that there was an active warrant pending for Witcher's arrest. Officer Hanko initiated a traffic stop and approached the driver's side of the vehicle. Witcher did not give Officer Hanko his name, but Officer Hanko testified, "I asked him if he was the registered owner of the vehicle." Officer Hanko recalled, "When he responded yes, I asked him to step out immediately." Officer Hanko described Witcher as being in an "excited state," a "strange state, just tensing up." Witcher repeatedly asked "what's going on," and Officer Hanko noted that he seemed agitated. Officer Hanko testified, "From my training and experience, I believe[d] him to be under the influence of some kind of narcotic." After Witcher was outside of the vehicle and detained in handcuffs, Officer Hanko requested his identification. Officer Hanko recalled that Witcher "said it was on the floorboard of his car. He said he dropped it." Witcher gave Officer Hanko permission

---

[2] Having examined the briefs and record in this case, the panel unanimously holds that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed." Code § 17.1-403(ii)(b); Rule 5A:27(b).

[3] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

[4] The record also refers to this motel as the Mary-Kay Motel.

to retrieve his wallet, and Officer Hanko testified, "I saw his wallet there on the floorboard right at the base of [the] driver seat where I retrieved it from."

Officer Webb arrived and notified Officer Hanko that he observed "potential drug materials" in the vehicle. Officer Hanko testified, "I walked up to the front passenger window where I used my flashlight to look down on the floorboard where I observed two torn and folded lottery tickets." After confirming that the car was his, Witcher denied knowing what was in the car but then added, "I am going to get a whole lot of charges because of what's in there, and I don't know what the hell in there because I just woke up." Witcher then told Officer Hanko that his nephew or the nephew's girlfriend had driven it, and he claimed that he had been driving his daughter's car.

The officers searched the car and found a fully loaded Taurus G3 handgun under the driver's seat, a box of 9 mm caliber ammunition, loose ammunition, and 20-25 unused lottery tickets in the center console. The officers also found a Calvin Klein backpack on the passenger seat and a digital scale with white powder residue under the passenger seat. The backpack contained three bags of substances. The officers also seized a restaurant take-out box from the back seat containing a "white, rock-like substance." Officer Webb testified that Witcher told him that "he and his wife would have an explanation for the bag," but that Witcher did not ever indicate who owned the bag. When Officer Webb transported Witcher to the jail, Witcher also told him that his wife had the car and that a cousin had potentially been in the car.

Officer Nicholas Lante, who also assisted with the stop, described Witcher's demeanor as "erratic." Officer Lante recalled, "I observed him pacing back and forth. He was shouting. He would jump at some points." Officer Lante further recalled, "There was a point [when] a firearm was recovered from the vehicle. And the defendant began jumping and screaming." Officer

- 3 -

Lante placed Witcher in his police car, advised him of his *Miranda*[5] rights, and asked him if he was using drugs. When asked "did he tell you when he last used drugs," Officer Lante testified, "He did. He stated yesterday." He was arrested and charged with possession of a firearm and of ammunition by a violent felon, possession of a firearm while possessing controlled substances with the intent to distribute, concealing a firearm as a felon, and two counts of possession of controlled substances with the intent to distribute having previously been convicted of a similar offense.

Officer Webb drove Witcher to the jail, where a deputy searched him. During the search, the deputy found a bag containing a white substance in the small pocket of Witcher's shorts. Officer Hanko recalled that Witcher "said he had purchased personal use drugs" and "stated it was Molly." Officer Hanko further recalled that Witcher later told the magistrate that the substance was "BC and methamphetamine not for personal use." Witcher also told the magistrate that the gun the officers found in his car belonged to his wife.

At the bench trial, Witcher pleaded not guilty. He stipulated to the admission of the certificates of analysis produced by the Department of Forensic Science (DFS), which analyzed the substances found in his car and on his person, as well as the functionality of the firearm. The certificate of drug analysis reported 11 to 12 grams of cocaine, just over 6 grams of fentanyl, and 4.8 grams of methylenedioxy.[6]

Detective Herrington of the Chesterfield County Police Department qualified as an expert witness in the investigation of narcotics possession and distribution. Detective Herrington characterized the area around the Martha-Kay Motel as a high-crime and drug trafficking area. He described some items that he would look for while investigating drug distribution and trafficking,

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Methylenedioxy is commonly known as ecstasy.

including "[p]ackaged material, scale, any type of trade of distribution." He testified, "We commonly see digital scales or any type of scale to measure their product." He explained, "The drug traffickers might come with a firearm or carry firearms on their person." He stated that cutting agents, like BC powder, creatine, and any type of white powder, are common. Detective Herrington testified, "A lottery ticket is [the] most common package we see on the streets." Detective Herrington explained that a typical dose of ecstasy was between a half-gram and a gram, and the usual dose of fentanyl was "one or two grams." Detective Herrington also indicated that the amounts of ecstasy, fentanyl, and cocaine found in Witcher's possession, bundled in baggies and folded in lottery tickets, were not consistent with personal use.

The Commonwealth admitted a certified copy of Witcher's previous felony conviction without objection. After the Commonwealth presented its evidence at trial, Witcher's counsel moved to strike the evidence. Witcher argued that there was nothing except his presence in the car that connected him to the drugs and the firearm. The trial court denied the motion to strike.

Renisha Fleming, Witcher's daughter, testified that Witcher had given her the keys to his car at noon on the day of his arrest. She testified that her car was "messed up. It wasn't working. I had lost the key, so I wasn't able to drive it." Witcher's counsel asked, "what did you have on you when you arrived to pick up the car," and Fleming recalled, "I had a black Taurus gun." She further recalled, "When I got in the car, I put it under the seat." Fleming testified that she had planned to go to the shooting range after getting groceries but had to change her plans because of an emergency with her son. Fleming testified, "When we got back to Martha-Kay, I knocked on the door but my father still didn't answer." Fleming recalled, "I just put the keys inside the cup holder." When asked about the gun, she explained, "I had forgot all about it being under there once I received the call I just started rushing." She confirmed that she did not have a concealed weapon permit but testified, "I like putting it under the seat other than just having it out when I have other people riding

with me." When asked whether she saw her cousin at the Martha-Kay Motel when she dropped off the car, Fleming denied knowing the nephew Witcher had mentioned. She claimed that she did not know that her father was a felon or that he was on the sex offender registry.

Fleming testified that one of her passengers, Diamond Cox, had a black bag with her. Fleming had given Witcher's attorney a newspaper article about Cox to prove her existence, but on cross-examination, the Commonwealth pointed out that the article stated that Cox had been killed at 3:45 a.m. on the day Fleming said she picked her up at noon. Fleming insisted, "She was in my car."

Witcher testified in his own defense. When asked about the Martha-Kay, Witcher testified, "I was there for 24 hours. I was staying with my nephew." He explained that the car belonged to his nephew, even though he was the registered owner. Addressing Witcher, the trial court asked, "Your daughter has never met this nephew that you bought a car for?" Witcher responded that they had not met and explained, "He just came home from prison. It's my sister's son."

Witcher denied any knowledge of the gun under the driver's seat and denied that the clothing in the back of the car belonged to him. He denied selling or giving the drugs in his pocket to anyone. He also denied knowing what was in the black bag or the take-out box, and he testified that he was surprised that he had an outstanding warrant for his arrest. Witcher denied telling the officers that he had been at the Martha-Kay Motel for "three or four days." Witcher confirmed that he had told the police that the gun belonged to his wife. He acknowledged that there were drugs in his pocket but explained that he took them "[t]o keep me up from nightmares. Give me energy. To help with the pain."

At the close of his case, Witcher renewed his motion to strike on the sufficiency of the evidence. The trial court denied the renewed motion to strike.

Following closing arguments, the trial court found that Fleming's "story was completely fabricated and not credible in any way." The trial court noted Fleming's testimony that the gun was black, when it was grey with a black handle; that Diamond Cox, who was already dead, had put the black bag in the backseat of the car even though the bag was found in the front seat; and that she got the car keys from Witcher despite his claim that he never saw her. The trial court found his spontaneous statement at the traffic stop to be significant: "I'm going to get a whole lot of charges because of what's in there."

The trial court convicted Witcher of possession of a firearm by a convicted felon, possession of ammunition by a convicted felon, possession of a firearm while distributing controlled substances, felon with a concealed weapon, and two counts of possession of schedule I/II controlled substances with the intent to distribute, second or subsequent offences. The trial court later sentenced Witcher to 40 years of incarceration with 24 years suspended. Witcher now appeals to this Court.

## ANALYSIS

### I. Sentencing

Witcher argues,

> The trial court abused its discretion by sentencing the defendant to
> an active period of incarceration of 5 (five) years for possession of
> ammunition, 10 (ten) years with 7 (seven) years suspended for
> possession of schedule I/II controlled substance with intent to
> distribute 2nd offense, 10 (ten) years with 7 (seven) years
> suspended for possession of schedule I/II controlled substance with
> intent to distribute 2nd offense, and 5 (five) years for possession of
> firearm by a convicted felon.

Witcher specifically argues that the trial court did not consider his mitigating evidence.

A trial court's sentence is reviewable on appeal for an abuse of discretion. *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563 (2016). The Supreme Court has adhered to the principle that criminal sentencing decisions "must rest heavily on judges closest to the facts of the case—

those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* (emphasizing that "the judge closest to the contest is the judge best able to discern where the equities lie" (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015))). In addition, it is well settled that the Virginia Criminal Sentencing Commission's sentencing guidelines "are discretionary, rather than mandatory." *Woodard v. Commonwealth*, 287 Va. 276, 281 (2014) (quoting *West v. Dir., Dep't of Corr.*, 273 Va. 56, 65 (2007)). Furthermore, "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du*, 292 Va. at 564 (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). Thus, "once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565).

A second conviction under Code § 18.2-248(C) requires that the defendant "be sentenced to imprisonment for life or for any period not less than five years, three years of which shall be a mandatory minimum term of imprisonment to be served consecutively with any other sentence." Code § 18.2-308.2 provides, "any person who violates this section by knowingly and intentionally possessing or transporting any firearm and who was previously convicted of a violent felony as defined in § 17.1-805 shall be sentenced to a mandatory minimum term of imprisonment of five years." Witcher received two convictions under Code § 18.2-248(C) and two convictions under Code § 18.2-308.2, so his mandatory minimum sentence totaled 16 years of incarceration. "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason*, 69 Va. App. at 99 (quoting *Minh Duy Du*, 292 Va. at 565).

Furthermore, nothing in the record supports Witcher's contention that the trial court did not consider his mitigating evidence. In fact, the trial judge expressly stated that it was giving him "credit for the good things you did," including his forthright interactions with the officers.

## II. Sufficiency of the Evidence

Witcher also argues, "The evidence in this case is insufficient to prove beyond a reasonable doubt that Mr. Witcher possessed a firearm, ammunition, and/nor any of the illegal substances alleged in the charges with the intent to distribute." Witcher contends that the evidence proved only that he was close to the contraband.

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

### A. Constructive Possession

"It is well-established that to obtain a conviction for such possessory offenses, the Commonwealth must produce evidence sufficient to allow a rational factfinder to conclude beyond a reasonable doubt that the defendant intentionally and consciously possessed the contraband with knowledge of its nature and character." *Garrick*, 303 Va. at 183. To prove constructive possession, "the Commonwealth must point to evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and character of the contraband and that the contraband was subject to his dominion and control." *Id.* "Indeed, in some cases circumstantial evidence may be the only type of evidence which can possibly be produced." *Pijor*, 294 Va. at 512 (quoting *Stamper v. Commonwealth*, 220 Va. 260, 272 (1979)). As the Supreme Court has previously stated, "the issue of constructive possession 'is largely a factual one and must be established by evidence of the acts, declarations and conduct of the accused.'" *Smallwood v. Commonwealth*, 278 Va. 625, 631 (2009) (quoting *Ritter v. Commonwealth*, 210 Va. 732, 743 (1970)).

Witcher was charged with four firearm-related possession charges and two controlled substance possession charges. In this case, Witcher was the only person in the car. Although he claimed that the car belonged to his nephew, the car was registered in Witcher's name. The fully loaded Taurus G3 handgun was found under the driver's seat—near Witcher's wallet, which was retrieved from the driver's side floorboard. A box of 9 mm caliber ammunition was in the console adjacent to the front seat. The items were within easy reach while Witcher drove the car. "A conviction for the unlawful possession of a firearm can be supported exclusively by evidence of constructive possession; evidence of actual possession is not necessary." *Durham v. Commonwealth*, 303 Va. 310, 326 (2024). Proximity to the firearm is a circumstance probative of possession and may be considered as a factor in determining whether the defendant possessed the

firearm. *Id.* at 326-27. Therefore, we certainly cannot say that no rational factfinder could have found the evidence sufficient to find that Witcher was in constructive possession of the firearm.

Officer Hanko also observed two torn and folded lottery tickets, which were identified as potential drug packaging materials, in the front passenger floorboard of the car. The officers also found 20 to 25 unused lottery tickets in the center console, which Detective Herrington described as a common way to package controlled substances. Furthermore, the officers found a digital scale with white powder residue under the passenger seat. In addition, the officers found a Calvin Klein bag containing three bags of substances—later identified as cocaine, fentanyl, and methylenedioxy (ecstasy)—in the front passenger seat. As with the firearm, the drugs were within Witcher's reach. "Although close proximity to contraband standing alone is insufficient to establish constructive possession," it was a circumstance the fact finder was entitled to consider. *Garrick*, 303 Va. at 188-85. Furthermore, the trial judge reasonably rejected Witcher's suggestion that someone had left such a large quantity of different drugs behind. The Supreme Court has previously held that "[a] factfinder is permitted to infer that '[items] . . . of significant value [are] unlikely to be abandoned or carelessly left in an area.'" *Id.* at 186 (alterations in original) (quoting *Ervin v. Commonwealth*, 57 Va. App. 495, 517 (2011) (en banc)). Therefore, we certainly cannot say that no rational factfinder could have found that Witcher was in constructive possession of the controlled substances.

Further, Witcher's spontaneous utterance that he would get "a lot of charges" for the items in the car evinced his knowledge that the contraband was present—and was subject to his dominion and control. His false explanation revealed his guilty knowledge of the presence and character of the items. *Hawkins v. Commonwealth*, 288 Va. 482, 486 (2014) ("A false account, similar to flight from a crime scene, is a circumstance a fact-finder may properly consider as evidence of guilty

knowledge."). The trial court rejected the proffered innocent explanations for the presence of the contraband, and we find no reason to disturb the trial court's judgment.

### B. Intent to distribute

"Several factors may constitute probative evidence of intent to distribute a controlled substance. These factors include the quantity of the drugs seized, the manner in which they are packaged, and the presence of an unusual amount of cash, equipment related to drug distribution, or firearms." *Gregory v. Commonwealth*, 64 Va. App. 87, 100 (2014) (quoting *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)). "Because direct proof of intent [to distribute drugs] is often impossible, it must be shown by circumstantial evidence." *Scott v. Commonwealth*, 55 Va. App. 166, 172 (2009) (en banc) (alteration in original) (quoting *Servis v. Commonwealth*, 6 Va. App. 507, 524 (1988)). "Accordingly, the fact finder may consider such factors as the quantity of the drugs seized and the presence of equipment or other items related to drug distribution." *Burrell v. Commonwealth*, 58 Va. App. 417, 434 (2011) (citing *McCain*, 261 Va. at 493).

In this case, the gun was within easy reach under the driver's seat of the car. *Scott*, 55 Va. App. at 174 ("[F]irearm[s are] a recognized tool of the drug trade."). Witcher also possessed quantities of several different drugs that Detective Herrington opined were inconsistent with personal use. This Court has previously held that "unique, simultaneous possession of a combination of disparate drugs can be indicative of the possessor's intent to distribute." *Id.* In addition, the car where the drugs and gun were found contained a digital scale with a white powder residue on the surface—and also contained items known to be used as packaging material for drug distribution. Therefore, we certainly cannot say that no rational factfinder could have found that Witcher was in possession of controlled substances with the intent to distribute.

## CONCLUSION

For all of the foregoing reasons, we do not disturb the judgment of the trial court.

*Affirmed.*